ANSCHUTZ COMPANY, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

PHILIP F. AND NANCY P. ANSCHUTZ, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 18942–07, 19083–07.         Filed July 22, 2010.

P–PA, an individual, owned P–AC, an S corporation. TAC
is a wholly owned qualified subch. S subsidiary of P–AC, and
its items of income and gain are reported on P–AC's Federal
tax return. P–PA used TAC as an investment vehicle. TAC
held the stock of companies that P–PA decided to invest in.
TAC entered into a master stock purchase agreement (MSPA)
for the sale of some of those corporate stocks in 2000 and
2001 to DLJ, an investment bank. The MSPA consisted of for-
ward contracts and share-lending agreements. The forward
contracts were prepaid in cash and would be settled with vari-
able numbers of shares of stock. The share-lending agree-
ments called for TAC to lend the shares of stock subject to the
forward contracts to DLJ. P–PA and P–AC treated the MSPA
as an open transaction and did not report any gain or loss on
the transfers of stock. R determined that the MSPA was a
sale of stock and that P–AC was liable for built-in gains tax
pursuant to sec. 1374, I.R.C., as a result of TAC's income and
gain being reported on P–AC's return. R also determined that
there were deficiencies in the personal income tax of P–PA,
the sole shareholder of P–AC, as a result of adjustments
including in his income a distributive share of the built-in
gain. Under sec. 1058, I.R.C., no gain or loss is recognized by
a taxpayer who transfers securities pursuant to an agreement
that meets the requirements of sec. 1058(b), I.R.C. Sec. 1259,
I.R.C., provides for constructive sale treatment if a taxpayer
enters into a transaction listed in sec. 1259(c)(1), I.R.C. *Held*:
The MSPA constituted a sale and TAC and P–AC must recog-
nize gain to the extent of the upfront cash payments received
in 2000 and 2001; the MSPA called for the lending of shares
but did not meet the requirements of sec. 1058(b), I.R.C.,
because it limited TAC's risk of loss. *Held*, *further*, TAC did
not engage in constructive sales of stock in 2000 and 2001
pursuant to sec. 1259, I.R.C.

*Robert A. Rudnick*, *Jonathan R. DeFosse*, *Richard J.
Gagnon, Jr.*, and *Thomas S. Martin*, for petitioners.
*Dennis M. Kelly*, *Michael Cooper*, and *Jennifer
Auchterlonie*, for respondent.

GOEKE, *Judge*: This deficiency case turns on the treatment of stock transactions entered into by the Anschutz Corp. (TAC), a qualified subchapter S subsidiary of the Anschutz Co., during 2000 and 2001. TAC entered into a master stock purchase agreement (MSPA) to sell shares of stock to an investment bank. The MSPA also called for TAC to lend those same shares to the bank. The issue is whether this sale agreement with concurrent share lending requires TAC, and its parent, Anschutz Co., to recognize built-in gain upon entering into the transaction. For the reasons stated herein, we conclude that TAC and Anschutz Co. must recognize gain to the extent of the upfront cash payments received in 2000 and 2001 exceed TAC's basis in the stock.

FINDINGS OF FACT

1. *General Background*

Some of the facts have been stipulated, and the stipulations of fact and the attached the exhibits are incorporated herein by this reference.

Philip F. Anschutz (Mr. Anschutz) resided in Colorado at the time he filed his petition.[1] Mr. Anschutz was the sole shareholder of Anschutz Co. and is a calendar year taxpayer. Anschutz Co. was incorporated in Delaware on July 25, 1991. At the time it filed its petition, Anschutz Co.'s principal place of business was Denver, Colorado. Anschutz Co. elected, effective August 1, 1999, to be treated as an S corporation under section 1362.[2]

TAC was incorporated in Kansas on December 17, 1959, and its principal place of business was in Denver, Colorado. At all times during 2000 and 2001 Anschutz Co. owned all of the outstanding stock of TAC.

Anschutz Co. elected to treat TAC as a qualified subchapter S subsidiary under section 1361(b)(3)(B)(ii). As a result, all assets, liabilities, income, deductions, and credits of TAC were treated as those of Anschutz Co. on the latter's Federal income tax returns for 2000 and 2001.

---

[1] Nancy P. Anschutz is a party because she and Mr. Anschutz filed joint Federal income tax returns.

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The stock transactions at issue were entered into by TAC. We refer to Mr. Anschutz and Anschutz Co. collectively as petitioners.

Respondent determined that TAC's stock transaction should have been treated as a closed sale. Because TAC is a qualified subchapter S subsidiary, its income would be reported on Anschutz Co.'s tax return. As a result, respondent determined that Anschutz Co. was liable for deficiencies in built-in gains tax under section 1374 of $49,724,005 and $63,856,385 for 2000 and 2001, respectively. Because Anschutz Co. is an S corporation and thus a flow-through entity, these determinations caused adjustments to Mr. Anschutz's distributive share of Anschutz Co.'s income and gain. As a result of these adjustments, respondent determined correlative deficiencies of $12,081,726 and $17,941,239 in Mr. Anschutz's income tax for 2000 and 2001, respectively.

2. *Background of the Transactions at Issue*

Beginning in the 1960s, Mr. Anschutz invested in and operated companies engaged in oil exploration and developing natural resources. During the past two decades Mr. Anschutz invested in and operated railroad companies. Mr. Anschutz's decision to invest in a particular company typically left him holding large blocks of its stock. Mr. Anschutz used TAC as an investment vehicle to hold these stocks.

Over the past decade Mr. Anschutz began investing in real estate and entertainment companies. These activities included ownership of the Staples Center in Los Angeles, California, the Los Angeles Kings of the National Hockey League, and the Los Angeles Galaxy of Major League Soccer. In the late 1990s and early 2000s Mr. Anschutz needed substantial amounts of cash to fund the acquisition, development, and expansion of these new business ventures.

In the course of researching various financing vehicles to fund its expanding real estate and entertainment enterprises, Mr. Anschutz and executives at Anschutz Co. consulted with Donaldson, Lufkin & Jenrette Securities Corp. (DLJ). [3] Mr. Anschutz and Anschutz Co. decided to raise funds

---

[3] The principal party to the stock transactions with TAC was DLJ Cayman Islands, LDC. DLJ Cayman Islands and Donaldson, Lufkin & Jenrette Securities Corp. were subsidiaries of Donaldson, Lufkin & Jenrette, a U.S. investment bank. On Nov. 3, 2000, DLJ was acquired by Credit

by causing TAC to enter into transactions with DLJ involving the appreciated stock owned by TAC. Mr. Anschutz believed that these transactions would allow TAC to receive cash, using the appreciated stock as collateral, without having caused a sale for Federal income tax purposes.

TAC entered into long-term sale and lending agreements with regard to the stock at issue. The sale agreements were memorialized by a master stock purchase agreement (MSPA) and various accompanying documents but were referred to by petitioners as "Prepaid Variable Forward Contracts" (PVFCs). These PVFCs were accompanied by share-lending agreements (SLAs) with respect to the shares subject to the PVFCs.

TAC and DLJ negotiated the structure, basic provisions, and terms of all of the memorializing documents for the PVFCs and the SLAs used in implementing the stock transactions over the course of a year. The parties disagree whether the PVFCs should be viewed separately from the SLAs or as part of an integrated transaction.

3. *The Transactions*

   a. *PVFCs*

A forward contract is an executory contract calling for the delivery of property at a future date in exchange for a payment at that time. A PVFC is a variation of a standard forward contract. In a typical PVFC, a securities owner (the forward seller) holding an appreciated equity position enters into a forward contract to sell a variable number of shares of that equity position. The purchaser prepays its obligation under the PVFC to purchase a variable number of shares on a future date. At the maturity date of the contract, the forward seller will settle the contract by delivering either: (1) Shares of stock that had been pledged as collateral at inception of the contract; (2) identical shares of the stock;[4] or (3) cash. Typically the number of shares or the amount of cash to be delivered at maturity is determined at or near the con-

Suisse First Boston, Inc. (CSFB). This acquisition did not materially affect the terms of the stock transactions. We will refer to Donaldson, Lufkin & Jenrette, its subsidiaries, and CSFB as DLJ for simplicity.

[4] "Identical" in this context does not mean the exact shares pledged at inception, but shares of stock of the same corporation and class as those pledged at inception. This allows the seller to retain the original shares but acquire additional shares in the open market at or around the contract's maturity and deliver those shares instead.

tract maturity date according to the market price of the stock at issue.

Consider a taxpayer holding 100 shares of Corporation X stock, trading at $10 per share. The taxpayer enters into a PVFC to deliver a number of shares in 1 year and receives a $1,000 upfront cash payment. If the stock is trading at $10 or below, the taxpayer must deliver all 100 shares. If the stock is trading at $20, the taxpayer must deliver 50 shares or $1,000 cash.

b. *Share-Lending Agreements*

Share-lending agreements are often entered into by equity holders who have taken a long position with respect to a stock and plan on holding it for an extended period. The equity owner can agree to lend the stock to a counterparty, who can then use the borrowed shares to increase market liquidity and facilitate stock sales. For example, the equity owner can lend shares to an investment bank, which could then use the lent shares to execute short sales on behalf of its clients.

The borrower will normally pledge cash collateral, and the lender will derive a profit lending the shares by retaining a portion of the interest earned by this cash collateral. At the end of the lending period, the counterparty will return the borrowed shares to the equity owner/lender.

4. *TAC's Transactions*

a. *Transaction Terms*

Mr. Anschutz caused TAC to enter into the MSPA. Both the PVFCs and the SLAs were governed by the same transaction documents. DLJ was the counterparty, and Wilmington Trust Co. (WTC) served as the collateral agent.

The PVFCs required DLJ to make an upfront payment to TAC in exchange for a promise by TAC to deliver a variable number of shares to DLJ 10 years in the future. TAC and DLJ negotiated two issues: (1) The amount of DLJ's upfront payment in relation to the fair market value of the shares; and (2) the amount of appreciation TAC would be entitled to retain over the term of the PVFCs.

TAC and DLJ decided that DLJ would make an upfront payment equal to 75 percent of the fair market value of the

shares subject to the PVFCs. The parties also agreed that there would be a ceiling on TAC's entitlement to any appreciation in the stock over the term of the PVFC. If the fair market value of the stock at issue in the PVFC were to increase over the term of the contract, TAC was entitled to retain the first 50 percent of this appreciation. Any additional appreciation above the first 50 percent would accrue to DLJ.

The MSPA also required TAC to pledge collateral in exchange for the upfront cash payment under the PVFC and required TAC and DLJ to execute pledge agreements for each transaction schedule. TAC pledged the shares of stock at issue in the PVFCs as collateral for the upfront payment and to guarantee TAC's performance under the PVFC. The pledged shares were delivered to WTC as trustee. The pledge agreements further required WTC to enter into SLAs with DLJ. WTC held title to the stock pursuant to the pledge agreements and acted as TAC's agent in entering into the SLAs. TAC received a prepaid lending fee calculated by reference to the value of the lent shares (discussed in detail below); the fee was generally equal to 5 percent of the fair market value of the shares lent under the SLAs.

The diagram below illustrates the general outline of the transaction.



b. *Transaction Documents*

The stock transactions were memorialized in the MSPA. The MSPA required the execution of a transaction schedule for each stock at issue. TAC and DLJ executed three transaction schedules.

The MSPA also required that for each transaction schedule the parties execute a pledge agreement establishing collateral accounts with WTC. Pledge agreements were executed, corresponding to the three transaction schedules. Each pledge agreement required WTC as collateral agent and DLJ to execute an SLA that would allow WTC to lend shares of stock to DLJ. Three SLAs were executed corresponding to the three pledge agreements.

Although each transaction schedule governed a certain number of shares of stock, these base numbers of shares were further divided into smaller segments for each PVFC, called "tranches". A tranche is a number of related securities that are part of a larger securities transaction. The MSPA required that each PVFC and each instance of share lending be memorialized by a pricing schedule and notice of bor-

rowing, respectively. Each pricing schedule and notice of borrowing caused the establishment of a tranche.

There were a total of 10 pricing schedules and notices of borrowing executed pursuant to the 3 transaction schedules and 3 SLAs. Transaction 1 was made up of six tranches; transaction 2 was made up of three tranches; and transaction 3 was made up of one tranche.

The amounts of the upfront payments and the numbers of shares to be delivered were decided by reference to formulas and definitions contained in the MSPA, discussed in more detail below.

i. *MSPA*

The MSPA between TAC as seller and DLJ as buyer was entered into on May 9, 2000. The MSPA provided the basic framework for the stock transactions and defined certain terms and requirements that applied to all of the stock transactions. The MSPA also included terms that would apply differently depending on the specific transaction schedule or pricing schedule at issue. These terms would be defined in greater detail in the transaction schedule or pricing schedule as each was executed.

ii. *Transaction Schedules*

As stated previously, TAC and DLJ executed three transaction schedules pursuant to the MSPA. Each corresponded to a different corporate security.

Each transaction schedule identified the issuer, the type of security at issue, and the maximum number of shares that would be subject to the transaction. The transaction schedule further defined certain terms, initially defined and contained in the MSPA, as they would apply to all of the shares governed by that specific transaction schedule. These terms included the effective date and maturity dates of the transaction, the "Minimum Average Hedge Price", the "Hedging Termination Date", the "Threshold Appreciation Price Multiplier", the "Purchase Price Multiplier", and the "Maximum Borrow Cost Spread Trigger".

The effective date of a transaction schedule was the date on which TAC and DLJ executed the transaction schedule. Each transaction schedule had a range of maturity dates

beginning on the 10th and ending on the 11th anniversary of the effective date of the transaction.

Each stock transaction between TAC and DLJ was preceded by DLJ's executing short sales of that stock in the open market. These short sales had to be executed between the effective date of a transaction schedule and the hedging termination date. The hedging termination date was the final date for DLJ to execute short sales to determine the "average hedge price".

### iii. *Pricing Schedules*

Each individual stock transfer made pursuant to a transaction schedule was memorialized by a pricing schedule. The execution of a pricing schedule established a tranche for that transaction.[5] The sum of the base shares in each tranche equaled the number of shares subject to the transaction schedule.

These terms included: (1) The average hedge price; (2) the downside protection threshold price; (3) the threshold appreciation price; (4) the purchase price; (5) the payment schedule (within 5 days of execution of the pricing schedule); (6) the tranche notice date; and (7) the maturity dates.

The information in each pricing schedule was generated by DLJ's executing short sales of the stock that would be in the tranche. These short sales in effect hedged DLJ's risk on the forward contract, because the short sales protected DLJ from a decrease in stock value during the term of the PVFC.

The average hedge price was the average price DLJ received on its short sales. The average hedge price and the downside protection threshold price were equal. The downside protection threshold price is so named because it represents the lowest value that TAC could receive for its shares on the settlement date. This in effect locked in a value per share that TAC would get credit for when the PVFCs were settled.

TAC's entitlement to the first 50 percent of any appreciation of the shares was represented in the transaction

---

[5] Each individual tranche had both a transaction number and a tranche number. Thus, a tranche could be identified as T1T1, where the first number was the number of the transaction and the second was the number of the tranche within that transaction. Thus, the six tranches under transaction 1 can be represented as T1T1 through T1T6, the three tranches under transaction 2 as T2T1 through T2T3, and the tranche under transaction 3 as T3T1.

schedule by the threshold appreciation price multiplier and in the pricing schedule by the initial threshold appreciation price multiplier of 1.50. The initial threshold appreciation price multiplier was applied to the average hedge price to calculate the threshold appreciation price. The threshold appreciation price was the maximum amount per share that TAC would retain.

In sum, TAC was entitled to retain any stock value above the downside protection threshold price and below or equal to the threshold appreciation price. Any value per share above the threshold appreciation price accrued to DLJ.

The short sales and accompanying information were used to determine the upfront payment TAC was entitled to receive under each tranche. This upfront payment was equal to 75 percent and was represented in the transaction schedule by a purchase price multiplier of .75. The amount of the upfront payment was calculated in each pricing schedule. The base number of shares in a tranche was multiplied by the average hedge price and the purchase price multiplier of .75. The resulting amount was the upfront payment made to TAC under the PVFCs.

### iv. *Pledge Agreements*

The MSPA required TAC and DLJ to establish collateral accounts to hold shares subject to the MSPA, the transaction schedule, and the pricing schedule. TAC and DLJ entered into three pledge agreements, each corresponding to one of the three transaction schedules.

WTC served as collateral agent. Each pledge agreement provided for the establishment of collateral accounts with WTC, delivery to WTC of the number of shares initially subject to the applicable transaction and tranche, the creation of security interests in the pledged shares, and release of these pledged shares to WTC. The pledge agreement also dealt with the treatment of income and distributions related to the pledged shares.

### v. *SLAs*

The MSPA and the pledge agreements required WTC to enter into SLAs with DLJ that allowed DLJ to borrow from WTC the shares pledged as collateral.

Three SLAs were executed, corresponding to the three transaction schedules and pledge agreements entered into under the MSPA. Individual acts of borrowing were initiated by DLJ. The separate SLAs, like the transaction schedules, were divided into separate tranches. Each tranche was established by the filing of a notice of borrowing with WTC.

The tranche establishment notice assigned a tranche number and identified the number of shares subject to the SLA tranche. Each notice of borrowing corresponded to a specific tranche established under one of the three transaction schedules. Thus, for each pricing schedule tranche T1T1 through T3T1, there is a corresponding share-lending tranche.

The SLAs further provided procedures for the transfer of shares, periodic payments of dividends and distributions with respect to the shares at issue, payment of fees, guaranties, and the recall of shares lent under the agreement. The SLAs provided that TAC could recall the pledged shares by notifying WTC, which would then inform DLJ of the recall. Upon receiving notice, DLJ would return the number of borrowed shares subject to that specific recall to TAC's collateral accounts at WTC. If TAC recalled shares from DLJ, it would have to return a pro rata portion of the prepaid lending fee it received upon the initial share lending.

c. *Acceleration Provisions*

Each PVFC had a maturity date of 10 to 11 years after execution. However, DLJ could, pursuant to the MSPA, accelerate the settlement date of a PVFC if certain events occurred. If DLJ accelerated a transaction, TAC would have to deliver a number of shares that would vary with the parties' relative economic positions at the time of acceleration.

DLJ could accelerate a PVFC only if certain events occurred, including TAC's filing for bankruptcy or a material change in TAC's economic position such that it was unclear whether TAC would be able to satisfy its obligations under the PVFC. Lastly, DLJ could accelerate the settlement of a PVFC if it was unable to hedge its position with respect to the stock at issue in the PVFC.

d. *Execution of PVFCs and SLAs*

Each individual PVFC was executed according to the same steps. DLJ, upon receiving notice that TAC wanted to execute a PVFC, would borrow shares of the stock at issue[6] in the pricing schedule from an unrelated third party and sell those shares in the open market as part of a short sale. These short sales would be used to generate the information in the pricing schedule and to determine TAC's upfront payment. These short sales were executed between the execution date of the pricing schedule and the hedging termination date, and the results of the short sales were compiled in the pricing schedule. The short sale proceeds were used to fund the upfront payment made as part of the PVFC and left DLJ with an obligation to close out the short sale by transferring identical shares to the original third-party lender. The PVFCs and the short sales worked to cancel out DLJ's risk of loss on the stock purchases. If the fair market value of stock subject to the PVFCs dropped over the course of the contract, the short sales would earn a profit; if the fair market value increased, the PVFCs would earn a profit.

DLJ would not execute one short sale for the entire amount of stock at issue in the pricing schedule. Instead, DLJ would split the number of shares over a number of different short sales as part of the process for establishing each tranche. The various prices received on these short sales were then averaged to determine the average hedge price for the tranche.

The other terms of the various pricing schedules memorializing each tranche under the MSPA were determined on the basis of these initial short sales. As stated previously, the average hedge price equaled the downside threshold protection price. The base number of shares was multiplied by the average hedge price and the purchase price multiplier to determine TAC's upfront payment. The downside protection threshold price was multiplied by the initial threshold appreciation price multiplier to determine the maximum amount of value per share that TAC would be entitled to keep if the stock appreciated.

---

[6] The corporate stocks at issue in the transactions are all widely traded and available, so the borrowing of shares to execute a short sale was not difficult.

The cash proceeds of the short sales were used to fund the upfront payment of the PVFCs. Payment was made within 5 days of delivery of the pricing schedule to TAC.

5. *TAC's Three Transactions*

a. *Transaction 1*

On May 9, 2000, TAC and DLJ executed a transaction schedule pursuant to the MSPA for transaction 1. Transaction 1 implemented a stock transaction with respect to a maximum of 10 million shares of Union Pacific Resources Group, Inc. (UPR) common stock.

The transaction schedule for transaction 1 provided an effective date of May 9, 2000, and a range of maturity dates from the 10th to the 11th anniversary of the effective date. The transaction schedule further provided a hedging termination date of December 31, 2000, an initial threshold appreciation price multiplier of 1.50, and a purchase price multiplier of .75. Although the MSPA allowed TAC to settle with either cash or securities, the transaction schedule deleted the cash settlement option.

On May 9, 2000, TAC, DLJ, and WTC entered into a pledge agreement with respect to the stock subject to transaction 1.

As stated previously, transaction 1 was divided into six tranches, corresponding to six pricing schedules. Three of the six pricing schedules were for a total of 4 million shares of UPR common stock. The other three were for a total of 2,217,903 shares of Anadarko Petroleum Corp. (APC) common stock.

The pricing schedule for T1T1 was dated May 12, 2000, and was for 1.5 million shares of UPR common stock. T1T1 had an average hedge price of $21.49.[7] TAC received an upfront cash payment of $24,181,087 for T1T1. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T1T1. The borrowing tranche was for 1.5 million shares of stock. DLJ actually borrowed 1,449,000. TAC received a prepaid lending fee of $1,640,143 for these shares.

The pricing schedule for T1T2 was dated May 12, 2000, and was for 1.5 million shares of UPR common stock. T1T2 had an average hedge price of $21.49. TAC received an

---

[7] All prices are rounded to two decimal places.

upfront cash payment of $24,181,087 for T1T2. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T1T2. The borrowing tranche was for 1.5 million shares of stock. DLJ actually borrowed 1,449,000. TAC received a prepaid lending fee of $1,640,143 for these shares.

The pricing schedule for T1T3 was dated June 9, 2000, and was for 1 million shares of UPR common stock. T1T3 had an average hedge price of $23.76. TAC received an upfront cash payment of $17,818,725 for T1T3. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T1T3. The borrowing tranche was for 1 million shares of stock. DLJ actually borrowed 1 million. TAC received a prepaid lending fee of $1,131,914 for these shares.

On July 14, 2000, UPR merged with APC. As a result, the 4 million shares at issue in tranches T1T1 through T1T3 were converted to 1,820,000 shares of APC common stock. The 3,898,000 shares actually lent pursuant to lending tranches established under T1T1 through T1T3 were converted to 1,773,590 shares of APC common stock. Further, tranches 4–6, discussed below, dealt with shares of APC common stock, not UPR common stock.

The pricing schedule for T1T4 was dated August 8, 2000, and was for 951,117 shares of APC common stock. T1T4 had an average hedge price of $49.85. TAC received an upfront cash payment of $35,559,530 for T1T4. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T1T4. The borrowing tranche was for 951,117 shares of stock. DLJ actually borrowed 747,182. TAC received a prepaid lending fee of $2,370,635 for these shares.

The pricing schedule for T1T5 was dated August 10, 2000, and was for 633,393 shares of APC common stock. T1T5 had an average hedge price of $52.49. TAC received an upfront cash payment of $24,937,189 for T1T5. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T1T5. The borrowing tranche was for 633,393 shares of stock. DLJ actually borrowed 523,984. TAC received a prepaid lending fee of $1,662,479 for these shares.

The pricing schedule for T1T6 was dated August 10, 2000, and was for 633,393 shares of APC common stock. T1T6 had an average hedge price of $52.49. TAC received an upfront cash payment of $24,937,189 for T1T6. DLJ executed a share-lending notice, establishing a borrowing tranche cor-

responding to T1T6. The borrowing tranche was for 633,393 shares of stock. DLJ actually borrowed 523,984. TAC received a prepaid lending fee of $1,662,479 for these shares.

b. *Transaction 2*

On December 5, 2000, TAC and DLJ executed a transaction schedule for transaction 2 for 2 million shares of Union Pacific Corp. (UPC) common stock. It was later amended to allow for a maximum of 3 million shares of UPC common stock. The transaction schedule for transaction 2 stated an effective date of December 5, 2000, a range of maturity dates, a hedging termination date of January 30, 2001, an initial threshold appreciation price multiplier of 1.50, and a purchase price multiplier of .75. The transaction schedule further stated that transaction 2 could not be settled in cash.

On December 5, 2000, TAC and DLJ executed a pledge agreement for the shares subject to transaction 2. On February 9, 2001, DLJ and WTC, as agent for TAC, entered into an SLA with respect to the shares at issue in transaction 2.

Transaction 2 was executed through three pricing schedules. The pricing schedule for T2T1 was dated January 4, 2001, and was for 750,000 shares of UPC common stock. T2T1 had an average hedge price of $50.56. TAC received an upfront cash payment of $28,440,562 for T2T1. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T2T1. The borrowing tranche was for 750,000 shares of stock. DLJ actually borrowed 750,000. TAC received a prepaid lending fee of $1,896,037 for these shares.

The pricing schedule for T2T2 was dated January 4, 2001, and was for 750,000 shares of UPC common stock. T2T2 had an average hedge price of $51.09. TAC received an upfront cash payment of $28,742,681 for T2T2. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T2T2. The borrowing tranche was for 750,000 shares of stock. DLJ actually borrowed 750,000. TAC received a prepaid lending fee of $1,916,178 for these shares.

The pricing schedule for T2T3 was dated January 16, 2001, and was for 1.5 million shares of UPC common stock. T2T3 had an average hedge price of $51.61. TAC received an upfront cash payment of $58,061,250 for T2T3. DLJ executed a share-lending notice, establishing a borrowing tranche cor-

responding to T2T3. The borrowing tranche was for 1.5 million shares of stock. DLJ actually borrowed 1.5 million shares. TAC received a prepaid lending fee of $3,870,750 for these shares.

### c. *Transaction 3*

On April 5, 2001, TAC and DLJ executed a transaction schedule for transaction 3 to execute a stock transaction with respect to a maximum of 2 million shares of UPC common stock.

On April 5, 2001, TAC, DLJ, and WTC entered into a pledge agreement with respect to the shares subject to transaction 3. WTC, as agent for TAC, and DLJ entered into an SLA with respect to the shares of transaction 3.

Transaction 3 consisted of only one pricing schedule for all 2 million shares at issue. The pricing schedule for T3T1 was dated April 25, 2001, and had an average hedge price per share of $56.07. TAC received an upfront cash payment of $84,109,350 for T3T1. DLJ executed a share-lending notice, establishing a borrowing tranche corresponding to T3T1. The borrowing tranche was for 2 million shares of stock. DLJ actually borrowed 2 million shares. TAC received a prepaid lending fee of $5,607,290 for these shares.

### d. *Total Payments Received*

TAC received upfront payments under the PVFCs totaling $350,968,652 and $23,398,050 in prepaid lending fees under the SLAs.

## 6. *Later Years*

### a. *Amendments to Documentation*

The parties to the MSPA have continued to monitor the transactions with regard to their business goals. DLJ, for instance, has continued to adjust its hedges under the PVFCs. The MSPA, pledge agreements, and SLAs were amended on June 13, 2003, to reflect DLJ's being acquired by CSFB and to introduce the concept of "share reduction cash payments". This amendment dealt with cash dividends or dividend equivalent payments received by TAC with respect to the stocks subject to the transactions at issue. The share reduction program gave TAC two options: (1) It would pay DLJ cash

equal to any cash dividends or dividend equivalent payments; or (2) use the payments to acquire additional shares of the particular stock at issue and pledge those additional shares as collateral under the pledge agreements.

b. *Share Recalls*

In 2006, during respondent's audit of petitioners, TAC recalled a portion of the shares pursuant to its authority under the SLAs. The decision to recall shares was an attempt by petitioners to show respondent that the SLAs were valid.

Shortly before trial, petitioners recalled the remaining shares lent under the SLAs. The shares of stock were recalled to again show the legitimacy of the SLAs and TAC's right of recall. In both instances, TAC paid DLJ a pro rata portion of the prepaid lending fee, as required by the SLAs.

7. *Settling the PVFCs at Maturity*

The PVFCs will be settled at their maturity dates when it will be determined how many shares, or the cash equivalent, must be delivered to DLJ (the settlement shares). The MSPA sets out the process for calculating the settlement shares or amount of cash that TAC must deliver.

The number of settlement shares required to be delivered at a PVFC's maturity date is determined by multiplying the base number of shares in each tranche by the average settlement ratio. The average settlement ratio will be calculated before the maturity date and is determined by reference to the adjusted settlement price.

The adjusted settlement price will be the New York Stock Exchange trading value multiplied by the distribution adjustment factor. The distribution adjustment factor is applied in order to account for any distributions made with respect to the stock at issue at or near the maturity date.

Once the adjusted settlement price is calculated, it will be compared to the downside protection threshold price and the threshold appreciation price, which, as discussed above, provided the range of values in which TAC would keep some appreciation of the stock.

If the adjusted settlement price was less than or equal to the downside protection threshold price, the average settlement ratio will be 1. Applying a ratio of 1 to the base number

of shares means that TAC will be required to deliver at most the base number of shares and will not have to return any additional value to DLJ. In effect, if the adjusted settlement price was less than or equal to the downside protection threshold price, then TAC just had to deliver the number of shares at issue in the tranche. No matter how far the value of the stock fell, TAC would not have to return any portion of the upfront cash payment. Thus, the downside threshold protection price locked in a minimum value that TAC was guaranteed to receive credit for.

If the adjusted settlement price was between the downside protection threshold price and the threshold appreciation price, the average settlement ratio was a ratio that when applied to the base number of shares in each tranche would reduce TAC's ultimate delivery obligation by a certain number of shares. The shares TAC was entitled to keep would be equal in value to any appreciation of the stock that TAC was entitled to retain.

If the adjusted settlement price was greater than the threshold appreciation price, the average settlement ratio was a fraction that when applied to the base number of shares in each tranche would allow TAC to keep the first 50 percent of appreciation and allow any excess appreciation to go to DLJ as previously explained.

Once the average settlement ratio was determined, it was multiplied by the base number of shares in each tranche. TAC was then required to deliver that number of shares to DLJ to satisfy its obligation under the PVFCs. The shares used to settle the PVFCs could be those in TAC's collateral accounts at WTC (to which the lent shares were returned) or similar shares. Alternatively, cash could be used to make the settlement payment.

### 8. *Procedural Posture*

Mr. Anschutz and Anschutz Co. treated the PVFC portions of the MSPA as open transactions and not as closed sales of stock. Neither reported gain or loss from the stock transactions on his or its Federal income tax returns.

TAC had bases during 2000 of $0.87 and $1.91, respectively, in the UPR and APC shares subject to transaction 1. TAC had a basis of $1.51 during 2001 in the UPC shares subject to

transactions 2 and 3. On August 22, 2007, respondent issued a notice of deficiency to Anschutz Co. for tax years 2000 and 2001. The notice of deficiency determined that TAC had entered into closed sales of stock, had received 100 percent of the fair market value for the stock, and thus was liable for section 1374 built-in gains tax in 2000 and 2001 to the extent the value received exceeded Anschutz Co.'s basis in the stock. The built-in gains tax was calculated by reference to the shares of stock that were pledged to WTC, then borrowed by DLJ. The deficiencies do not include shares pledged as collateral by TAC but not borrowed by DLJ.

Because S corporations are flow-through entities, the built-in gain respondent determined on Anschutz Co.'s returns, less the tax on that gain, then flowed to Mr. Anschutz. On August 22, 2007, respondent issued a notice of deficiency to Mr. Anschutz for 2000 and 2001. The notice of deficiency determined deficiencies in Mr. Anschutz's income tax with respect to the adjustments to Anschutz Co.'s tax liabilities.

On August 21, 2007, Anschutz Co. filed its petition in docket No. 18942–07. On August 23, 2007, Mr. Anschutz filed his petition in docket No. 19083–07. A trial in these consolidated cases was held on February 9–10, 2009, in Washington, D.C.

Respondent submitted an expert report in support of his position that closed sales of stock occurred in 2000 and 2001. Petitioners submitted a report in rebuttal.

### OPINION

The Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer bears the burden of proving, by a preponderance of the evidence, that these determinations are incorrect. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining the taxpayer's liability and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. Neither party addressed the burden of proof. Because we decide this case on the basis of the preponderance of the evidence, we need not decide upon which party the burden rests.

Section 61(a)(3) provides that gross income includes gains derived from dealings in property. Section 1001(a) provides that the gain from the sale or other disposition of property shall be the excess of the amount realized over the adjusted basis, as calculated by reference to section 1011.

The stocks at issue were owned by TAC, a qualified subchapter S subsidiary. Normally, an S corporation is not subject to Federal income taxes. Sec. 1363(a). Like a partnership, it is a conduit through which income and loss flow to its shareholders. Normally, if an S corporation disposes of stock, any gain on the disposition will flow to the corporation's owners.

Anschutz Co. elected S corporation status on August 1, 1999. Anschutz Co. also elected to treat TAC as a qualified subchapter S subsidiary under section 1361(b)(3)(B). As a result, all income, deductions, and credits of TAC were includable in Anschutz Co.'s Federal income tax returns for 2000 and 2001.

Section 1374(a) provides an exception to the general rule of flow-through treatment. Section 1374(a) imposes a corporate-level tax on the net recognized built-in gain of an S corporation that has converted from C corporation to S corporation status. The tax generally applies to built-in gain recognized during the 10-year period beginning with the first taxable year for which the corporation is an S corporation. See sec. 1374(d)(7). Built-in gain is measured by the appreciation of any asset over its adjusted basis at the time the corporation converts from C corporation to S corporation status. *N.Y. Football Giants, Inc. v. Commissioner*, 117 T.C. 152, 155 (2001); see sec. 1374(d)(3). An S corporation generally is not liable for the built-in gains tax on the disposition of any asset if it establishes that it did not own the asset on the day it converted from C to S status, or that the fair market value of the asset was less than its adjusted basis on the first day of the first taxable year for which it was an S corporation. *N.Y. Football Giants, Inc. v. Commissioner*, *supra* at 155.

TAC owned the stock at issue and entered into the stock transactions with DLJ. Because the fair market value of the stock exceeded its adjusted basis on the first day TAC became a qualified subchapter S subsidiary, the built-in gains tax will be triggered if the stock transactions are treated as com-

pleted sales for Federal income tax purposes. Because TAC is treated as a qualifying subchapter S subsidiary, its assets, liabilities, and items of income and deductions are attributed to its parent, Anschutz Co. Petitioners concede that if we find the PVFCs and the SLAs constitute sales for Federal tax purposes, then the built-in gains tax will apply.

Because Anschutz Co. is an S corporation, Mr. Anschutz would normally have to report Anschutz Co.'s income on his own return. Section 1366(f)(2) provides that any section 1374 tax paid by an S corporation is treated as a loss sustained by that corporation. *N.Y. Football Giants, Inc. v. Commissioner*, *supra* at 157 & n.5. If we find that Anschutz Co. was required to report gain upon TAC's entering into the MSPA, Anschutz Co. will be required to pay built-in gains tax. This tax will then be treated as a loss for Anschutz Co. See sec. 1366(f)(2). Treating the stock transactions as closed sales will have an impact on Mr. Anschutz's distributive share of Anschutz Co.'s income and loss, consisting of an increase in his income to the extent the gain from sale treatment exceeds the built-in gains tax. Accordingly, respondent determined deficiencies in Mr. Anschutz's income tax as a result of determining that built-in gain from the stock transactions was attributable to Anschutz Co.

Respondent puts forth two arguments in support of his determinations: (1) That the MSPA triggered a sale under section 1001; and (2) that there was a constructive sale under either section 1259(c)(1)(A) or (C). We will address each in turn.

## I. *Section 1001 Sale of Stock*

### A. *Respondent's Argument*

Respondent argues that TAC's transfers of stock during 2000 and 2001 should be treated as closed transactions for Federal tax purposes. His argument comprises three parts: (1) TAC transferred legal title and the benefits and burdens of ownership; (2) the SLAs are not true lending arrangements, but a way for TAC to deliver the shares of stock to DLJ; and (3) TAC transferred the shares to DLJ in exchange for an ascertainable amount of consideration equal to 100 percent of the fair market value of the stock.

To determine whether an agreement transfers substantially all of the incidents of ownership, we look at all of the facts and circumstances surrounding the transfer, relying on objective evidence of the parties' intentions provided by their overt acts. *Ragghianti v. Commissioner*, 71 T.C. 346, 349–350 (1978); *Pac. Coast Music Jobbers, Inc. v. Commissioner*, 55 T.C. 866, 874 (1971), affd. 457 F.2d 1165 (5th Cir. 1972); *Dunne v. Commissioner*, T.C. Memo. 2008–63.

In *Dunne v. Commissioner*, *supra*, we compiled the following nonexclusive factors that are evaluated in determining whether a transaction transfers the accoutrements of stock ownership:

(1) Whether the taxpayer has legal title or a contractual right to obtain legal title in the future;

(2) whether the taxpayer has the right to receive consideration from a transferee of the stock;

(3) whether the taxpayer enjoys the economic benefits and burdens of being a shareholder;

(4) whether the taxpayer has the power to control the company;

(5) whether the taxpayer has the right to attend shareholder meetings;

(6) whether the taxpayer has the ability to vote the shares;

(7) whether the stock certificates are in the taxpayer's possession or are being held in escrow for the benefit of that taxpayer;

(8) whether the corporation lists the taxpayer as a shareholder on its tax return;

(9) whether the taxpayer lists himself as a shareholder on his individual tax return;

(10) whether the taxpayer has been compensated for the amount of income taxes due by reason of shareholder status;

(11) whether the taxpayer has access to the corporate books; and

(12) whether the taxpayer shows by his overt acts that he believes he is the owner of the stock.

No one factor is necessarily determinative, and the weight of a factor in each case depends on the surrounding facts and circumstances. *Id.*

Respondent argues that in determining whether a sale occurred, we must look at all relevant documents to determine whether TAC has transferred the indicia of ownership.

Respondent contends that this includes the MSPA, all transaction schedules, all pledge agreements, and all SLAs. Respondent argues that all of these documents must be analyzed because they are interrelated and the parties treated the PVFCs and the SLAs as one transaction.

1. *Did TAC Transfer Legal Title and the Benefits and Burdens of Ownership*?

Respondent points out that TAC transferred legal title to the stock but concedes that transfer of title without transfer of the benefits and burdens of the stock might not qualify as a sale for Federal tax purposes. Respondent further argues that TAC transferred the benefits and burdens of ownership upon entering into the MSPA, including: (1) The right to vote the pledged shares as a shareholder; (2) control and the right to dispose of the pledged shares; and (3) substantially all of TAC's economic rights in the pledged shares. TAC received substantial upfront cash payments for the shares.

2. *Were the SLAs Legitimate Share-Lending Agreements?*

Although respondent next argues that TAC transferred a number of indicia of ownership to DLJ, were we to give effect to the SLAs according to their terms, TAC's ability to recall the shares would accordingly return those rights and indicia of ownership to TAC. To that end, respondent argues that the SLAs were not true share-lending agreements but merely a means of delivering the shares to DLJ pursuant to stock sales. If we agree with respondent that the SLAs were not true share-lending agreements and the shares of stock could not actually be recalled, it would support respondent's arguments that the benefits and burdens of stock ownership were transferred to DLJ along with legal title to the pledged stock.

Respondent's argument concerning the SLAs is based on his contention that the SLAs do not conform with industry standards governing typical share-lending agreements. Respondent contends that TAC's SLAs lack the following attributes normally found in a share-lending agreement: (1) A pledge of liquid collateral; (2) a securities lending fee payable by the borrower; (3) a right exercisable by the lender to receive distributions payable on the securities; and (4) a right exer-

cisable by the lender to demand return of the lent shares without substantial conditions or restrictions.

### 3. *TAC Received 100 Percent Value in 2000 and 2001*

Respondent argues that TAC received 100 percent of the fair market value of the pledged shares in 2000 and 2001, not only the cash payments equal to 80 percent of the fair market value of the stock at that time.

As discussed above, TAC is entitled to retain any stock value above the downside protection threshold price and below or equal to the threshold appreciation price. Respondent argues that this right can be valued as an equity option. Respondent also argues that TAC's right to any dividends can also be valued as an equity option. Respondent relies on his expert report in calculating the fair market values of these options.

Respondent contends that because the SLAs are not legitimate, any additional value that TAC is entitled to keep at the PVFC maturity dates is more properly viewed as a payment from DLJ to TAC than as TAC's retaining shares of stock. In accordance with this view, respondent contends that TAC, instead of being able to retain shares, was given equity options that would pay out should the stock appreciate or any dividends be paid out on the stocks.

Respondent's valuation of this equity option and the dividend option and DLJ's fees for entering into the transactions make up the difference between the 80 percent of the fair market value of the shares received as cash and 100 percent of the fair market value of the stock at the time TAC and DLJ entered into the transaction.

Respondent contends that TAC received the 100 percent as follows: (1) 75 percent of the fair market value as the upfront cash payment under the pricing schedules; (2) 5 percent of the fair market value as the prepaid lending fee; (3) an equity option equal in value to the present value of any appreciation in the pledged shares above the downside protection threshold and not in excess of the threshold appreciation price; (4) a dividend option equal in value to the present value of any dividend rights over the term of the PVFCs; and (5) the remainder as DLJ's fees for entering into and structuring the transaction.

B. *Petitioners' Argument*

Petitioners argue that TAC executed two separate transactions—PVFCs and SLAs—and neither constitutes a current sale for Federal tax purposes.

Petitioners argue that the PVFCs are not current sales because the identity and quantity of stock being sold will not be determinable until the PVFC maturity dates. Petitioners contend that the taxpayer's basis, the holding period, and the number of securities to be sold cannot be known until the future delivery date, and it is therefore impossible for the parties to know how many shares will be sold and whether TAC will ultimately realize a gain or loss on the transaction.

Petitioners rely heavily on Rev. Rul. 2003–7, 2003–1 C.B. 363, and argue that the PVFCs at issue are substantially identical to those addressed in the revenue ruling. In Rev. Rul. 2003–7, *supra*, the taxpayer entered into a forward contract with an investment bank to deliver a variable number of shares of stock, depending on the fair market value of the stock on the delivery date.

The sale agreement required the taxpayer to pledge as collateral the maximum number of shares that might have to be delivered at maturity. Rev. Rul. 2003–7, *supra*, states that the taxpayer informed his counterparty bank that he intended to use the shares pledged as collateral to satisfy his ultimate delivery obligation.

The taxpayer received an upfront payment in exchange for his obligation to deliver stock at a later date and had the unrestricted right to deliver the pledged shares, cash, or identical shares to satisfy his delivery obligation. The revenue ruling held that the taxpayer had not caused a sale under section 1001.

Petitioners assert that any differences between the instant case and the PVFCs in Rev. Rul. 2003–7, *supra*, are immaterial, including the fact that the transaction schedules for transactions 1 and 2 deleted the cash settlement option. Petitioners point to testimony by DLJ employees that TAC could settle in cash, rather than in shares, because it made no difference to the bank. Petitioners further contend that their position is stronger than that of the taxpayer in Rev. Rul. 2003–7, *supra*, because, unlike the taxpayer in the ruling,

TAC never stated to DLJ that it intended to cover the PVFCs with the shares pledged as collateral.

Petitioners concurrently argue that the SLAs are not current sales. Petitioners point to longstanding caselaw that has held share lending not to be current sales and contend that Congress' enactment of section 1058 in 1997 reaffirms the tax-free nature of share-lending transactions.

Petitioners contend that the SLAs at issue satisfy the requirements of section 1058, which provides a special rule for determining taxation under agreements that call for the lending of shares of stock. Section 1058(a) provides that if a taxpayer transfers securities subject to an agreement that meets the requirements of section 1058(b), no gain or loss shall be recognized on the transfer in exchange for a promise to return identical shares at the end of the agreement period. Section 1058(b) imposes four requirements that must be met in order to satisfy that subsection.

(1) The agreement must provide for the return of identical securities. Sec. 1058(b)(1).

(2) If dividends, interest, or equivalent payments are made between the initial transfer by the transferor and the return of identical securities by the transferee with respect to the transferred shares, the agreement must provide for the payment of those amounts to the transferor. Sec. 1058(b)(2).

(3) The agreement must not reduce the risk of loss or opportunity for gain of the transferor in the securities transferred. Sec. 1058(b)(3).

(4) The agreement must meet any further requirements that the Secretary has prescribed by regulation. Sec. 1058(b)(4).

Petitioners argue that the SLAs do not violate section 1058(b) because: (1) DLJ is required to return shares to TAC of the same issuer, class, and quantity as those borrowed; (2) while the share loans are outstanding, DLJ is required to pay TAC amounts equal to all interest, dividends, and other payments with respect to the lent shares; (3) the SLAs do not reduce TAC's risk of loss or opportunity for gain in the borrowed shares.

Petitioners dispute respondent's contention that the SLAs are illusory and violate section 1058(b) because the PVFCs limit TAC's risk of loss. Petitioners argue that we should look only at the documents connected with the SLAs themselves,

not those connected with the PVFCs. Petitioners point to *Samueli v. Commissioner*, 132 T.C. 37, 48–49 (2009), and contend that this Court has rejected the idea that section 1058 allows looking beyond the lending agreement itself to simultaneously executed hedging transactions. In *Samueli v. Commissioner*, *supra* at 47, this Court held that a share-lending did not meet the requirements of section 1058(b) because it strictly limited the transferor's ability to recall the shares, thus reducing the transferor's opportunity for gain.

Petitioners point to proposed but never finalized regulations issued under section 1058 and contend that the determination of whether a share-lending agreement limits a lender's risk of loss is made by reference to the lender's ability to recall the lent shares. The proposed regulations indicate that an agreement to lend shares that allows the lender to terminate the loan upon notice of not more than 5 business days does not limit the lender's risk of loss. Petitioners argue that because the SLAs can be terminated upon TAC's demand and because the SLAs are separate and distinct from the PVFCs, they do not limit TAC's risk of loss and therefore satisfy the requirements of section 1058.

Petitioners conclude that because the PVFCs and the SLAs do not require petitioners to recognize gain, respondent's determinations should not be upheld.

C. *Analysis*

1. *Was There a Sale?*

We agree with respondent that the shares subject to the VPFCs and lent pursuant to the SLAs were sold for Federal income tax purposes. TAC transferred the benefits and burdens of ownership to DLJ in exchange for valuable consideration. Petitioners must recognize gain in an amount equal to the upfront cash payments received upon entering into the transactions.

TAC entered into an integrated transaction comprising two legs, one of which called for share lending. The transaction comprised PVFCs and SLAs. The two legs were clearly related and interdependent, and both were governed by the MSPA.

The MSPA required TAC to enter into a pledge agreement upon execution of a transaction schedule, and the pledge agreement required WTC to enter into an SLA with DLJ upon

execution of a pledge agreement. Further, if DLJ could not maintain its hedges (hedges based on TAC's lending shares to DLJ), DLJ could accelerate the PVFCs.

Lending the shares subject to the PVFCs was a vital part of the transaction and was contemplated during the parties' negotiations. While evaluating DLJ's potential as a source of financing, TAC and its executives viewed presentations by DLJ as to how the transactions at issue would occur. The presentation provided an overview of a transaction as a whole and stated that DLJ would borrow shares from TAC pursuant to the SLAs to cover its initial short sale obligation.

This is in line with testimony of TAC and DLJ executives involved in the planning and negotiating of the transactions. Scott Carpenter, a managing director of the Anschutz Investment Co., who was involved in the negotiations of the stock transactions, testified that the MSPA required execution of the pledge agreements, and the pledge agreements required execution of the SLAs. Philip Turbin, employed by DLJ during the negotiations with TAC, testified that the borrowed shares were used to close out the initial short sales. This is in line with the overall structure of the transaction as initially presented to TAC.

Petitioners argue that our decision in *Samueli* supports their contention that the SLAs were separate and distinct from the PVFCs. We disagree. The taxpayers in *Samueli* argued that the reduction of their opportunity for gain should not be determinative because they could have entered into a separate hypothetical transaction. *Samueli v. Commissioner*, *supra* at 48–49. This Court rejected the taxpayers' argument and analyzed the parties' actual agreement under section 1058. *Id.*

Petitioners mischaracterize the Court's ruling in *Samueli* when they argue that the PVFCs are outside the lending agreement. We have held that the agreement consists of both the SLAs and the PVFCs.

If we analyze the MSPA as a whole, it is clear that TAC transferred the benefits and burdens of ownership, including: (1) Legal title to the shares; (2) all risk of loss; (3) a major portion of the opportunity for gain; (4) the right to vote the stock; and (5) possession of the stock.

Neither petitioner nor respondent disputes that TAC transferred legal title to the stock. Likewise, neither party dis-

putes that TAC did not possess the stock or have the opportunity to vote the stock.

Analyzing the MSPA makes clear that TAC transferred all risk of loss and most of the opportunity for gain with regard to the stock subject to the PVFCs and lent to DLJ. TAC received 75 percent of the cash value of the stock up front. Even if the stock value fell over the term of the PVFCs, TAC would not have to pay any of this amount back. DLJ could do with the lent stock whatever it wanted and in fact disposed of the stock almost immediately to close out its original short sales.

The parties focus on the validity of TAC's right to recall the stock lent to DLJ. Petitioners argue that the ability to recall the shares means that TAC only temporarily transferred the benefits and burdens of ownership but could recall the stock at any time. Thus, in petitioners' view, although TAC transferred legal title, possession, the right to vote, risk of loss, and most opportunity for gain, the transfer was only temporary and could be rescinded at any time upon notice to WTC and DLJ.

Respondent argues that the recalls should be ignored because they were shams meant to influence the result of this case. In respondent's view, if we ignore the recalls, petitioner could not recall the benefits and burdens of ownership.

Although we agree with petitioners that TAC could recall the shares, the recalls were accomplished only to influence the tax analysis. The recalls were not a foreseeable economically motivated event when the transactions at issue were structured. They were rather an after-the-fact effort to change the earlier tax effect which was fixed in 2000 and 2001.

Once TAC lent shares to DLJ, DLJ used them to close out its original short sales. For all intents and purposes, those lent shares were gone and could not be recovered.

The transaction documents support a finding that the share recalls were really TAC borrowing shares from DLJ. Because DLJ closed out its original short sales with the lent shares, the shares later transferred to TAC were in substance DLJ borrowing shares from third parties and delivering them to TAC. Pursuant to the MSPA, TAC was required to pay back the prepaid lending fee plus an additional amount if DLJ's borrowing costs exceeded the amount of the prepaid lending

fee. With regard to the 2009 share recalls, TAC was required to bear any additional borrowing costs of DLJ.

Accordingly, we find that TAC transferred the benefits and burdens of ownership to DLJ in 2000 and 2001, and the later recalls were in substance a separate event akin to TAC borrowing shares.

Petitioners cannot avail themselves of section 1058. The MSPA violates the requirement of section 1058(b)(3) that the agreement not limit the lender's risk of loss or opportunity for gain. The MSPA eliminated TAC's risk of loss with regard to the lent shares.

The crux of petitioners' argument with regard to section 1058 is that the PVFCs are separate from the SLAs and that none of the transactions conducted pursuant to the PVFCs and the SLAs are taxable events. Petitioners' argument might hold true if the SLAs were separate and distinct from the PVFCs. However, the two are linked, and we cannot turn a blind eye to one aspect of the transaction in evaluating another.

TAC entered into one agreement that called for the lending of shares and limited its risk of loss. Once the PVFCs and the SLAs are viewed together, it is clear that the MSPA violates section 1058(b)(3) because the MSPA limited TAC's risk of loss under the agreement through its use of the downside protection threshold. The downside protection threshold guaranteed that no part of the payment, equal to 75 percent of the fair market value of the stock, received by TAC at initiation of the agreement would have to be paid back when the PVFCs were ultimately settled. At settlement, if the adjusted stock price was at or below the downside protection threshold, the average settlement ratio was 1. This meant that the maximum TAC had to deliver was the base number of shares in each tranche without any regard to the fair market value of those shares.

We can look to tranche T1T1 as an example. That tranche had an average hedge price of $21.49 and was for 1.5 million shares of UPR stock. TAC received an upfront payment of $24,181,087 for agreeing to deliver a variable number of shares 10 to 11 years in the future. Because of the loss limitation, TAC would never have to return that upfront payment. Even if the stock dropped to $1 a share, TAC would not have to account for this devaluation by giving back any por-

tion of their upfront payment. Petitioners could not lose any value per share if the fair market value dropped below the downward protection threshold price. This limitation of the risk of loss under the agreement violates section 1058(b)(3).

Petitioners contend that TAC's risk of loss was not limited because TAC could recall the shares. This argument is not convincing because it ignores the impact of the PVFCs. We cannot ignore that the SLAs were coupled with the PVFCs. Petitioners argue that the transactions are in no way related; but as discussed above, this is not credible.

The parties entered into an agreement to sell and lend shares by integrated transactions. The PVFCs and the SLAs were clearly related. One could not occur without the other. To the extent that petitioners argue TAC and DLJ could have entered into the PVFCs without corresponding share-lending agreements, that hypothetical transaction is not before the Court. The transaction before the Court transferred the benefits and burdens of ownership of the lent shares, and petitioners do not satisfy the section 1058 safe harbor.

### 2. *What Must Petitioners Recognize?*

We next determine the amount of gain petitioners must recognize on the MSPA. Respondent argues that TAC received value equal to 100 percent of the fair market value of the shares that were subject to the PVFCs and were lent pursuant to the SLAs. We disagree. Petitioners are required to recognize gain only to the extent TAC received cash payments in 2000 and 2001.

Respondent relies on his expert report in arguing that TAC received 100 percent of the fair market value. Respondent's argument in support of his contention that TAC received 100 percent of the fair market value upfront is that the SLAs were not legitimate and that TAC would never have possession of the shares after initially lending them to DLJ. Thus, the PVFCs would never actually be settled within the terms of the MSPA because TAC would never regain possession of the shares and never have to calculate and return shares to DLJ. Because TAC would never regain possession of the shares at issue, any gain TAC might receive upon appreciation of the stock was not really a retention of shares but could be viewed as a payment from DLJ to TAC equal in value to any stock

appreciation. Respondent's expert testified that this payment profile could be priced as the payout of equity options received in 2000 and 2001.

Although certain portions of TAC's contracts can be valued as equity options representing TAC's entitlement to some appreciation in price and future dividends, whether petitioners will ever receive that value will not be determined until the contracts are settled. Further, as respondent's expert testified, the probability of the stock price's being above the downward protection threshold price is only 43 to 48 percent for TAC's three transactions.

Respondent's determinations, to the extent they treat petitioners as having received additional value in excess of the cash received, are incorrect. Accordingly, petitioners must recognize gain to the extent TAC received cash upfront payments in 2000 and 2001, which would include the 75-percent payment based upon the fair market value of shares and the 5-percent prepaid lending fee.

## II. *Section 1259 Constructive Sale*

### A. *Respondent's Arguments*

Respondent argues in the alternative that TAC caused constructive sales of the stock at issue. Respondent asserts two alternative grounds for finding a constructive sale under section 1259: A constructive short sale by TAC under section 1259(c)(1)(A) and a constructive forward contract sale under section 1259(c)(1)(C).

Congress enacted section 1259 because it was concerned that taxpayers holding appreciated equity positions were entering into certain complex financial transactions in order to sell their positions without paying any tax. Section 1259(a)(1) provides that if there is a constructive sale of an appreciated financial position, the taxpayer shall recognize gain as if such appreciated position were sold at its fair market value on the date of such constructive sale. Any gain shall be taken into account for the taxable year during which the constructive sale occurred. Sec. 1259(a)(1). Section 1259(b)(1) provides in pertinent part that the term "appreciated financial position" means any position with respect to stock if there would be gain were such a position sold at its fair market value.

If a constructive sale of an appreciated financial position occurs, section 1259(a)(2) provides rules for adjusting the financial product's basis and holding period. Section 1259(a)(2)(A) provides that the owner of the appreciated financial position will increase his or her basis in that position to account for the gain recognized on the constructive sale. Further, the owner's holding period for the financial position will reset as of the date of the constructive sale. These rules are intended to prevent an owner of an appreciated financial position from having to recognize gain twice—once as of the date of the constructive sale, and again when the financial transaction leading to the constructive sale treatment eventually closes.

Section 1259(c)(1) lists certain transactions that are treated as constructive sales if entered into with respect to an appreciated financial position. Three of the enumerated transactions are relevant. Section 1259(c)(1)(A) provides that a taxpayer shall be treated as having made a constructive sale of an appreciated financial position if the taxpayer enters into a short sale of the same or substantially identical property. Section 1259(c)(1)(C) provides that a taxpayer is treated as having made a constructive sale with respect to an appreciated financial position if the taxpayer enters into a futures or forward contract to deliver the same or substantially identical property. Lastly, section 1259(c)(1)(E) allows the Secretary to prescribe regulations describing transactions that will be treated as constructive sales if they are substantially similar in effect to those listed in section 1259(c)(1)(A)–(D). Section 1259(d)(1) defines a forward contract as a contract to deliver a substantially fixed amount of property (including cash) for a substantially fixed price.

Respondent argues first that DLJ acted as an agent for TAC and executed a short sale on TAC's behalf for the stocks at issue in the PVFCs. Respondent argues that the constructive sale occurred as follows: (1) TAC informs DLJ that it intends to sell shares of stock pursuant to a transaction schedule; (2) DLJ, acting as TAC's agent, engages in the short sales used to generate the terms of a pricing schedule; (3) DLJ borrows shares pursuant to an SLA; and (4) DLJ uses the borrowed shares to close out the initial short sale.

Respondent argues in the alternative that the PVFCs trigger a constructive sale under section 1259(c)(1)(C)

because the MSPA is a forward contract to deliver "the same or substantially identical property" as TAC's appreciated financial positions in the stock at issue.

## B. *Petitioners' Arguments*

Petitioners dispute respondent's characterization of the transaction as a constructive sale under either section 1259(c)(1)(A) or (C).

Petitioners argue that there could be no constructive short sale under section 1259(c)(1)(A) because TAC did not cause any short sales to occur. Petitioners argue that DLJ was not acting as TAC's agent but rather was a counterparty to the transaction, and the decision to execute short sales was DLJ's alone.

Petitioners next argue that TAC did not cause a forward contract constructive sale under section 1259(c)(1)(C) because the PVFCs were not forward contracts: the number of shares to be delivered is not a substantially fixed amount of property. Petitioners again point to Rev. Rul. 2003–7, *supra*, and argue that because the revenue ruling found 20 percent to be a substantial variance, then 33.3 percent must be a substantial variance.

## C. *Analysis*

TAC did not cause constructive sales during 2000 and 2001. TAC did not cause short sales of substantially similar property or enter into forward contracts for a substantially fixed amount of property. DLJ was not acting as an agent for TAC; DLJ executed short sales in order to meet its contractual obligations to TAC. Further, use of the short sales was DLJ's hedging transaction, a means for DLJ to limit its losses on its purchase of TAC's stocks should they decrease in value. The constructive short sale provisions are intended to force a taxpayer to recognize gain upon entering into short sales that limit the taxpayer's loss. TAC did not limit its loss through short sales; DLJ did.

TAC's transactions were likewise not constructive forward contracts. As discussed above, a forward contract is treated as a constructive sale if it is for a substantially fixed amount of property for a substantially fixed price. Sec. 1259(c)(1)(C), (d)(1). Section 1259 does not define the terms "substantially

fixed amount of property" or "substantially fixed price". Section 1259 gives the Secretary two sources of authority for issuing regulations to carry out Congress' intent—section 1259(c)(1)(E) and (f)—but no regulations have been issued defining either phrase.

The legislative history provides some guidance as to determining whether a transaction is treated as a constructive sale under section 1259. The Senate Finance Committee report, S. Rept. 105–33, at 125–126 (1997), 1997–4 C.B. (Vol. 2) 1067, 1205–1206, in stating that a forward contract results in a constructive sale only if it provides for delivery of a substantially fixed amount of property at a substantially fixed price, goes on to say that "a forward contract providing for delivery of an amount of property, such as shares of stock, that is subject to significant variation under the contract terms does not result in a constructive sale." The report does not define or provide any guidance relative to the term "significant variation", and the Secretary has not issued any regulations interpreting this term.

The Senate Finance Committee report provides more detailed guidance when discussing the Secretary's regulatory authority under section 1259(c)(1)(E) to issue regulations to carry out the purpose of section 1259. *Id.* at 126, 1997–4 C.B. (Vol. 2) at 1206. Congress anticipated that the Secretary would use his authority to issue regulations treating as constructive sales financial transactions which, like those listed in section 1259(c)(1), have the effect of eliminating "substantially all of the taxpayer's risk of loss and opportunity for income or gain" with respect to the appreciated financial position. *Id.* However, transactions in which the taxpayer eliminated his risk of loss, or opportunity for income or gain, but not both, were not to be treated as constructive sales under section 1259. *Id.*

The report goes on to state that it is not intended that risk of loss and opportunity for gain be considered separately. If a transaction has the effect of eliminating substantially all of the taxpayer's risk of loss and substantially all of the taxpayer's opportunity for gain with respect to an appreciated financial position, it is intended that the Secretary's regulations would treat the transaction as a constructive sale. *Id.* Again, however, section 1259 and the legislative history do not define "substantially all".

Rev. Rul. 2003–7, *supra*, provides some limited guidance in evaluating whether TAC's PVFCs trigger constructive sale treatment. In that revenue ruling the taxpayer entered into a forward contract to deliver a variable number of shares of stock, depending on the fair market value of the stock on the delivery date. The taxpayer received an upfront payment in exchange for his obligation to deliver stock at a later date. The taxpayer's delivery obligation varied by 20 shares: the taxpayer would have to deliver no fewer than 80, and no more than 100, shares of the stock at issue. The revenue ruling held that the taxpayer had not entered into a constructive sale under section 1259(c)(1)(C) because the variation in the number of shares deliverable, 20, was significant, and the agreement was not a contract to deliver a substantially fixed amount of property for purposes of section 1259(d)(1).

TAC's stock transactions were not forward contract constructive sales because they were not forward contracts as defined in section 1259(d)(1)—they did not provide for delivery of a substantially fixed amount of property for a substantially fixed price. Section 1259 does not define the term "substantial", and the Secretary has not issued regulations providing any additional guidance. TAC's ultimate delivery obligation may vary by as much as 33.3 percent; this is in excess of the variance in Rev. Rul. 2003–7, *supra*. TAC may ultimately deliver between 6,025,261 and 9,037,903 shares of stock to settle the PVFCs. We find this variance in TAC's delivery obligation to be substantial. TAC did not cause a constructive sale under section 1259(c)(1)(C).

## III. *Conclusion*

Petitioners must recognize gain on the MSPA to the extent of cash received in 2000 and 2001. Petitioners did not cause a constructive sale under section 1259(c)(1)(C).

To reflect the foregoing,

*Decisions will be entered under Rule 155.*