STORROW et al. v. TEXAS CONSOLIDATED COMPRESS & MANU-
FACTURING ASS'N.

(Circuit Court of Appeals, Fifth Circuit.    May 17, 1898.)

No. 681.

**1. CORPORATIONS—DIVIDENDS ON STOCK—POWERS OF DIRECTORS.**
While it is largely a matter of discretion with the directors whether to declare a dividend out of the profits, or use them in the business of the company, there is a limit to this discretion; and the courts will not allow them to oppress the holders of preferred stock by refusing to declare dividends when the net profits and character of the business clearly warrant dividends.

**2. SAME—PREFERRED STOCK.**
The face value of preferred stock is in the nature of a debt against the corporation, and the interest thereon becomes a debt as soon as it can be shown there are profits wherewith to pay it.

**3. EQUITY JURISDICTION.**
A bill by a holder of preferred stock against a corporation alleging that it has refused to pay its guarantied dividends on its preferred stock, and refused the holders thereof their rights; that judgments are being taken against it; that it is insolvent, and cannot be operated as a going concern with profit, and ought to be disintegrated, and the assets divided; that part of its property has been sold without authority; and asking for a lien, the foreclosure thereof, the marshaling of the assets, and the appointment of a receiver,—presents a case for a court of equity.

Appeal from the Circuit Court of the United States for the Eastern District of Texas.

The original bill filed in this case November 18, 1896, alleges that the complainant Charles Storrow is a resident and citizen of Brookline, in the state of Massachusetts; that he brings this suit for himself and all others similarly situated and interested, to make themselves parties thereto, and complains of the Texas Compress & Manufacturing Association, a corporation, with its principal place of business in the county of Smith, state of Texas. It alleges that it was chartered on the 18th day of March, 1891, with an authorized capital of $1,000,000, divided into 10,000 shares; its purpose was the manufacture of cotton, cotton-seed oil, cotton ties, and pressing cotton; that in accordance with a vote at a meeting of its stockholders held at Ft. Worth, Tex., on the 11th day of May, 1891, and in accordance with section 2, art. 7, of the by-laws approved by said association, seven compresses were purchased; $700,000 of common stock, and $350,000 of preferred stock, were issued. Subsequently, four other bills were filed, called "aid bills." Said complainants claim to be owners and holders for value of some 400 shares of said preferred stock. The exact terms of the contract made by the company with the holders of the preferred stock are set out in the following certificate:

"No. 186.    100 Shares.

## "Texas Consolidated Compress & Manufacturing Association.

"This is to certify that Charles Storrow is the owner of one hundred shares preferred stock, of the par value of one hundred dollars each, in the capital stock in the Texas Consolidated Compress & Manufacturing Association, transferable only on the books of the association in person, or by attorney on surrender of this certificate.

"This certificate is entitled to a guarantied dividend of six per centum per annum on the number of shares hereby represented, to be paid only out of the net earnings of said association, payable annually on the first day of June of each year; and until such dividends, if any, are paid, no dividend shall be declared on the common stock of this association; but this certificate is not entitled to, nor shall it, participate in any dividends over and above said guarantied dividends as above stated, nor is it entitled to vote at any stockholders' meeting.  The directors of this association shall, at their annual meeting in each year, ascertain the net profits from the business of said association, and shall then and there declare such guarantied dividend of six per cent.

"All insurance policies upon property belonging to this association shall be held in trust by said association for the benefit of the holders of these certificates; and in the event of the dissolution of said association, either by limitation or otherwise, the holders of preferred shares shall be entitled to be paid in full prior to any participation in the assets of this association by other stockholders.  The company reserves the right to issue, in lieu thereof, first mortgage bonds, bearing interest at the rate of six per centum per annum, and secured by mortgage upon all the compresses of this association.

"Tyler, Texas, June 24, 1893.             Jno. M. Duncan, President.
    "[Seal.]                             J. D. Moody, Secretary."

Article 7, §§ 2 and 3, above referred to, are as follows:

"Sec. 2. Not exceeding $50,000 in six per cent. bonds or preferred stock, bearing six per cent. interest, or entitled to six per. cent. dividend, and $100,000 in common stock, shall be issued on each compress that may be owned and brought into this association.  Such preferred stock shall be entitled to six per cent. dividend or interest, and shall not be entitled to vote.

"Sec. 3. On the issuance of any bonds by this association, the association shall put aside, of the earnings of the association, 2 per cent. annually, as a sinking fund to liquidate the bonds thus issued, before any dividend is declared on the common stock."

Complainant further alleges, upon information and belief, and so charges the fact to be, that it was the intention of the parties who originally organized said defendant corporation, and all of the stockholders and directors of said corporation at the time of the issuance of said preferred stock, that, in a reasonably short time after the issuance thereof, said preferred stock should be converted into and substituted by first mortgage bonds of the same amount as the said stock, and bearing the same rate of interest per annum as is provided that the said stock shall bear, and that the first mortgage bonds should be secured by a mortgage upon all of said seven compresses then and there owned by the defendant association, as aforesaid; that, at the time complainant and others acquired said stock, it was known and generally understood, and complainant verily believed it to be the plan and purpose of said defendant association, and of all its officers, directors, and stockholders, to substitute said stock with first mortgage bonds of said association, as aforesaid, and that said preferred stock should be considered as, and be in effect, the same as first mortgage bonds of said association, and the holders thereof considered as creditors of said association to the extent of such preferred stock as should be held and owned by them; that the complainant was induced to acquire said preferred stock upon the statement and representation of J. H. Brown, who was the president, and John A. Brown, who was the secretary, of said association, that said stock was in effect a first mortgage bond, and would be converted into the form of a first mortgage bond at an early date.  Complainants claim a lien upon the net profits of the said association which may have been received upon any of its property,

and upon any property or betterments that may have been acquired by the net profits from the business. They further allege that sufficient net profit to pay the dividends due them on the preferred stock was earned during the years of 1892, 1893, 1894, 1895, and 1896, but that no such dividend was declared during said years, and that said association has wrongfully and willfully diverted the said net profits in divers ways, for the purpose of depriving complainants of their dividends, and for the purpose of depreciating and destroying the value of the preferred stock, so the owners of the majority of the common stock might purchase it at a nominal price. They allege a scheme on the part of the holders of the majority of the common stock to wreck the corporation; that judgments for large amounts were being obtained against the company, and large losses had occurred by the deposit in First National Bank of Tyler, which subsequently failed; that the attorney for the bank was the president of the defendant; and that the president of the bank was the general manager of the company, and that they so kept the funds of the company knowing the condition of the bank; that on May 4, 1897, a committee was appointed to prepare a plan for liquidating and winding up the affairs of the association, which reported the debts of the association to be $50,000, preferred stock outstanding $310,000, and the entire compresses owned by the association were worth $240,000. A committee was appointed to sell the property. The facts disclosed in said meeting were that the assets were of far less value than when the association commenced business, and that it is deeply in debt, and cannot pay its debts in due course of business; that the corporation cannot be operated as a going concern with any profit; and ought to be disintegrated, and the assets divided; that the association loaned its credit to the First National Bank of Tyler for $15,000, and sold the compress at Gatesville for $15,000, without authority; that the association has refused to take any action for the protection of the preferred stockholders, and its directors deny that said stockholders are entitled to any relief; that the complainant has demanded of the defendant that the dividends to which he is entitled be declared and paid, which demand has been refused.

The bill concludes with a prayer for a receiver, and an accounting and marshaling of the assets; that the rights of all creditors be ascertained, and the rank in which they are to be paid adjudged; for a decree compelling the directors to declare a dividend; that the preferred stockholders be declared to have a lien upon the net earnings which should have been paid to them, or upon the plant and properties purchased therewith prior to the lien of all others; that the stock be adjudged to be a first mortgage bond in effect, etc.; for an injunction prohibiting the defendant from taking any step or doing any act or thing that may affect the right of the complainant pending the litigation, or which may interfere with the enforcement of such decree as may be rendered: that complainant's lien be foreclosed, the property sold, cost paid, and the balance of proceeds applied to the indebtedness of the defendant according to its rank, as adjudged by the court.

Defendant's demurrers to the "aid bills" and amended bill are as follows: "This defendant, by protestation, not confessing nor acknowledging any of the matters or things in said bills of complaint contained to be true in such manner and form as the same therein set forth and alleged, doth demur to the said bills, and, for causes of demurrer, showeth: (1) That it appeareth by each complainant's own showing by each of said bills that he is not entitled to the relief prayed for by the bills against the defendant. (2) That there is no equity in the bills, and that it appears from the face thereof that, if the complainant be entitled to any relief, they have a full and adequate remedy at law. (3) That it appears by the bill that the complainants are not, nor either of them, creditors of the defendant, and have no lien upon the property of defendant. (4) That plaintiff's suits are, in effect, to dissolve defendant corporation, and to distribute its assets, of which proceeding a court of equity hath no jurisdiction. (5) That there are in the bills no facts set forth showing insolvency of defendant, but merely a naked averment of insolvency. (6) That it is not shown by said bills, nor either of them, that the defendant corporation is dissolved, nor that there exists any cause for its dissolution. (7) That complainants do not show that they have no remedy, through the corporation itself, for the alleged injuries com-

plained of. (8) That complainants do not allege demand on the corporation or its officers for the declaration of a dividend, nor demand for the payment of the dividends alleged to be due. (9) That the complainants do not show that they are those for whose benefit they sue, did not assent to, or that they protested against, any of the acts or omissions of which they complain. (10) That the bill shows that, if complainants ever had any cause for action against the defendant, the same is barred by their own laches. (11) That while the bills charge, in terms, fraud and bad faith, they set out no facts or circumstances showing the same, but and only warranted transactions, innocent in themselves, and arising from the exercise of that discretion and judgment committed to the directory by defendant's charter, by-laws, and by the laws of the land. (12) That while said bills charge a combination or conspiracy between H. H. Rowland and J. D. Moody, two of defendant's stockholders, to depress the value of its stock, the same does not show how, in any way, the corporation is responsible for their motives or actions, or how said Moody and Rowland 'dictated' and 'controlled' the action of the defendant corporation, in any other way than by voting stock which they were legally entitled to vote. (13) That paragraph 14 of said original bill insufficiently charges a scheme by said Rowland and Moody to acquire a majority of the common stock of defendant corporation, without alleging any of the facts or circumstances constituting said scheme, or that they acquired a majority of said stock in any other way than fairly and legally. (14) That such of the allegations of paragraph 14 of the original bill as are introduced by the words 'alleges upon information and belief,' and by the words 'is informed,' without charging such allegations to be true, are insufficient. (15) That the said bills undertake to vary or rather to substitute by parol the terms of a written instrument, the foundation of the action set out in the bills, to wit, the certificates of preferred stock in defendant corporation, upon which this suit is brought. (16) That neither of said bills contains allegations that the plaintiff was a shareholder in the defendant corporation at the time of the transaction of which he complains, or that his shares had devolved on him since, by operation of law, nor that the suit is not a collusive one to confer upon a court of the United States jurisdiction of a case of which it would not otherwise have cognizance; nor do said bills set forth any effort of either of the plaintiffs to secure such action as they desire on the part of the managing directors or shareholders of defendant. Wherefore, and for divers other good causes of demurrer appearing on said bill, the defendant doth demur thereto. It prays the judgment of this honorable court whether it shall be compelled to make any answer to said bills, and it humbly prays to be hence dismissed, with its reasonable costs in this behalf sustained."

W. S. Herndon and Ben B. Cain, for appellant.

John M. Duncan, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

SWAYNE, District Judge (after stating the facts). Much of the difficulty arises in this case from the want of a proper understanding of the difference between the common stock and preferred stock, and the respective rights of the holders thereof. Among the rights of the holders of common stock are those of attending and voting at the meetings of the corporation, participation in the election of officers, the formation of by-laws, the participation in the profits and losses, and in the final division of the property upon dissolution. A share of stock has been defined to be a right which its owner has in the management, profits, and ultimate assets of the corporation; but he has no legal title to the profits or property of the corporation until a dividend is declared, and a division made on the dissolution of the cor-

poration.    Common stock differs in many ways from what is termed "preferred stock."   The owner of the former is entitled to an equal pro rata division of the profits, if there be any, but has no advantage of any other shareholder or class of shareholders of common stock. Preferred stock, on the other hand, generally entitles its owner to dividends out of the net profits before and in preference of the holders of the common stock.    Generally, the rights, powers, and privileges of preferred stockholders depend upon the terms upon which it is issued; preferred stock making a multiplicity of forms, according to the desire or ingenuity of the stockholders, and the necessity of the corporation itself.    The percentage of preferred stock dividends is always fixed before it is issued.    It is a matter of contract, and may be made cumulative, as it was in this case.    Every holder of preferred stock, by its terms, was guarantied a dividend of 6 per cent. per annum thereon to be paid out of the net earnings of the association, which are properly the gross receipts, less the expenses of operation, interest on debts, and other liabilities payable first.    The rest is the net profits out of which the shareholders of preferred stock should be paid the 6 per cent. dividend.    While it was largely a matter of discretion with the board of directors as to what use they would put the profits to, whether to declare a dividend or use them in the business of the company, there is a limit to this discretion; and the courts will not allow the directors to use their powers oppressively by refusing to declare a dividend while the net profits and character of the business clearly warrant it.    This rule is applicable not only to the holders of the common stock, but also to the preferred stock, which is entitled, as a matter of right, to have a dividend declared out of the net profits, if it can be shown that the directors did not exercise reasonable discretion in withholding the same.    By the final dissolution of the corporation, the holders of the preferred stock would be entitled to receive only the full face value thereof, after which the balance of the property would be equally divided among the common stockholders.

The bill alleges, and the demurrer admits, that, during the time in question, the association had earned sufficient net profits from the operation of the compresses to pay the 6 per cent. dividend on its preferred stock.    It also states that the said association wrongfully and willfully diverted the net profits earned by it, and has used and appropriated the same in divers and sundry ways for the purpose of depriving the complainants of their dividends, and of destroying the value of the preferred stock; and this was done by the majority of holders of the common stock, in fraud of the rights of complainants.    While it has been determined that the claim of the holders of the preferred stock against the corporation is not strictly a debt, but is contingent upon the existence of sufficient net profits to pay it, it is evident that preferred stock is only a security for a loan, upon which a certain and definite interest was to be paid while the corporation existed, and the full amount thereof returned to the lender when it was dissolved, before the holders of the common stock should receive anything.    The preferred stockholder has no vote or voice in the management of the corporation.    He possessed none of the rights of a common stockholder as such, and

about the only difference between him and the ordinary lender of money was that he was not to receive his interest unless there were sufficient net profits to pay the same. Therefore, so far as the face value of the preferred stock is concerned, it is in the nature of a debt against the corporation, and the interest thereon becomes a debt as soon as it can be shown that there were profits wherewith to pay it, and becomes a lien prior to the rights of the holders of common stock upon the net earnings, if there were such, for the amount of the dividend, and can be followed wherever invested by the company. This contention is further maintained by the fact that the company reserved the right to issue, in lieu of the preferred stock, first mortgage bonds, bearing interest at the rate of 6 per cent. per annum, secured by a mortgage upon all the compresses of the association; thus making this loan represented by the preferred stock payable at any time upon the will of the corporation.

The other allegations in complainants' bill in regard to judgments; the insolvency of the corporation; that it could not be operated as a going concern with profit, and ought to be disintegrated, and the assets divided, and that part of the property had been sold without authority; that their right to have a dividend declared on their stock had been neglected and refused; that their right to receive the full face value thereof had been denied by the corporation,—are matters that can only be investigated and determined by a court of equity. The investigations of the amount of the net income, and the proper disposition thereof, the marshaling of assets, the priority of liens, and the foreclosure of same, as well as the prayer for injunction and receiver pendente lite, are proper matters for the consideration of the chancellor, and cannot be proceeded with in a court of law. The case made by the bill, if sustained by proof, would undoubtedly entitle complainants to relief. Therefore the decree dismissing the bill is reversed, and the case remanded, with instructions to grant a rehearing in the case, and proceed as equity may require.