141 T.C. No. 17

UNITED STATES TAX COURT

PILGRIM'S PRIDE CORPORATION SUCCESSOR IN INTEREST TO
PILGRIM'S PRIDE CORPORATION OF GEORGIA f.k.a. GOLD KIST, INC.
SUCCESSOR IN INTEREST TO GOLD KIST INC. AND SUBSIDIARIES,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12089-10.                    Filed December 11, 2013.

P is the successor in interest to G. G was contractually obligated to purchase, and in 1999 did purchase, securities from S and T for $98.6 million. The securities were capital assets of G. In 2004 S offered to redeem the securities for $20 million. G's board of directors decided to abandon the securities for no consideration because a $98.6 million ordinary loss would produce tax savings greater than the $20 million offered by S. On June 24, 2004, G voluntarily surrendered the securities to S and T for no consideration. On its Federal income tax return for the tax year ending June 30, 2004, G reported a $98.6 million ordinary abandonment loss deduction under I.R.C. sec. 165(a) pursuant to sec. 1.165-2(a), Income Tax Regs.

An abandonment loss cannot be claimed on a sale or exchange of property. Sec. 1.165-2(b), Income Tax Regs. Pursuant to I.R.C.

sec. 165(f) losses from sales or exchanges of capital assets are subject to the limitations on capital losses under I.R.C. secs. 1211 and 1212. I.R.C. sec. 1234A requires gain or loss attributable to the cancellation, lapse, expiration, or other termination of a right with respect to property that is (or on acquisition would be) a capital asset in the hands of a taxpayer to be treated as gain or loss from the sale of a capital asset.

Held: the securities are intangible property comprising rights that G had in the management, profits, and assets of S and T. Those rights were terminated when G surrendered the securities.

Held, further, the $98.6 million loss on the surrender of the securities is attributable to the termination of G's rights with respect to the securities, which are capital assets, and pursuant to I.R.C. sec. 1234A the loss is treated as a loss from the sale or exchange of capital assets.

Held, further, G is not entitled to an ordinary loss deduction for abandonment, because the loss is treated as a loss from the sale or exchange of capital assets pursuant to I.R.C. sec. 1234A. See sec. 1.165-2(b), Income Tax Regs.

Held, further, pursuant to I.R.C. sec. 165(f), P's losses from the surrender of the securities, deemed to be a sale or exchange under I.R.C. sec. 1234A, are subject to the limitations on capital losses under I.R.C. secs. 1211 and 1212.

Robert H. Albaral and Todd A. Schroeder, for petitioner.

John Wayne Duncan and J. Greg Marble, for respondent.

## OPINION

DAWSON, <u>Judge</u>:  Petitioner petitioned the Court pursuant to section 6213(a) and (f)(1)[1] for redetermination of a $29,682,682 deficiency in Federal income tax and a $5,936,536 accuracy-related penalty under section 6662(a) that respondent determined against petitioner as successor in interest to Gold Kist Inc. (GK Co-op), a Georgia cooperative marketing association, for its tax year ending June 30, 2004.  After a concession by respondent,[2] the only issue remaining for decision is whether a $98.6 million loss resulting from GK Co-op's abandonment of certain securities in 2004 is ordinary or capital.

## Background

This case was submitted fully stipulated pursuant to Rule 122.[3]  The stipulation of facts and the exhibits attached thereto are incorporated herein by this

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) of 1986 in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that petitioner is not liable for the accuracy-related penalty under sec. 6662(a) for the year at issue.

[3]On April 24, 2013, this case was reassigned by order of the Chief Judge to Judge Howard A. Dawson, Jr., for disposition.

reference. At the time petitioner filed its petition its principal place of business was in Pittsburg, Texas.

Petitioner is a corporation organized under the laws of the State of Delaware. It is the successor in interest to Pilgrim's Pride Corp. of Georgia f.k.a. Gold Kist, Inc., a Delaware corporation (GK Inc.), which was the successor in interest to Gold Kist Inc., a Georgia cooperative marketing association (GK Co-op). GK Co-op was organized as a cooperative association in 1936 under the Georgia Cooperative Marketing Act. Beginning in 1978, GK Co-op was taxed as a nonexempt cooperative under subchapter T of the Code and was required to file an annual Form 990-C, Farmers' Cooperative Association Income Tax Return.

In 1999 GK Co-op was contractually required to purchase certain securities for an aggregate total of $98.6 million from Southern States Cooperative, Inc. (Southern States), and Southern States Capital Trust I (Trust), a Delaware statutory trust established by Southern States.[4] Consequently, on October 5, 1999,

---

[4]Pursuant to an asset purchase agreement dated July 23, 1998, GK Co-op agreed to sell one of its divisions to Southern States for approximately $255 million paid in part in cash and in part by Southern States' assumption of certain liabilities. The sale was completed in October 1998. Southern States obtained a bridge loan which it expected to repay with funds raised in a public offering. As part of the financing arrangement, when Southern States failed to consummate the public offering by October 5, 1999, it required GK Co-op to purchase the securities central to the issue in this case. Southern States and the Trust filed a

(continued...)

GK Co-op purchased 40,000 shares of Step-Up Rate Series B Cumulative

Redeemable Preferred Stock (series B preferred stock)[5] of Southern States for

_____

[4](...continued)
Form S-1 with the U.S. Securities and Exchange Commission to register (i) capital securities in the Trust for sale to the public and (ii) common securities in the Trust for sale to Southern States. Southern States intended to use the proceeds from the sale of these securities to repay the outstanding principal balance of the bridge loan.

[5]The certificate evidencing the series B preferred stock states:

> This certifies that Gold Kist Inc. [GK Co-op] is the owner of Forty Thousand (40,000) fully-paid and non-assessable shares of the Step-Up Rate Series B Cumulative Redeemable Preferred Stock, of the par value of $100.00 each, with a stated liquidation preference of $1000.00 per share, of Southern States Cooperative, Incorporated (the "Association"), transferable on the books of the Association by the holder hereof in person or by duly authorized attorney upon the surrender of this certificate properly endorsed.

> \*     \*     \*     \*     \*     \*     \*

> The Association will furnish to any stockholder without charge, upon written request, a full statement of the designations, preferences, limitations and relative rights of the shares of the Step-Up Rate Series B Cumulative Redeemable Preferred Stock and to each other class or series of shares of the Association.

> The shares represented hereby have not been registered under the Securities Act of 1933 or under the securities laws of any state and are subject to certain restrictions on the transfer hereof, which restrictions are set forth in Section 9 of Article C(1)(c) of the Articles of Incorporation of the Association and in a Purchase Agreement of even date herewith between the Association and Gold Kist Inc.

$39.2 million and 60,000 shares of Step-Up Rate Capital Securities, Series A

(series A securities)[6] issued by the Trust for $59.4 million.  The series B preferred

_____

[6]The certificate evidencing the series A securities states:

Southern States Capital Trust I, a statutory business trust created under the laws of the State of Delaware (the "Issuer Trust"), hereby certifies that Gold Kist, Inc. [GK Co-op] (the "Holder") is the registered owner of Sixty thousand (60,000) capital securities (aggregate Liquidation Amount Sixty Million ($60,000,000) Dollars) of the Issuer Trust representing a preferred undivided beneficial interest in the assets of the Issuer Trust and designated the Step-up Rate Capital Securities, Series A (liquidation amount $1,000 per Capital Security) (the "Capital Securities").  The Capital Securities are transferable on the books and records of the Issuer Trust, in person or by a duly authorized attorney, upon surrender of this certificate duly endorsed and in proper form for transfer as provided in Section 5.5 of the Trust Agreement (as defined below).  The designations, rights, privileges, restrictions, preferences and other terms and provisions of the Capital Securities are set forth in, and this certificate and the Capital Securities represented hereby are issued and shall in all respects be subject to the terms and provisions of, the Amended and Restated Trust Agreement of the Issuer Trust, dated as of October 5, 1999, as the same may be amended from time to time (the "Trust Agreement"), among Southern States Cooperative, Incorporated, an agricultural cooperative corporation organized under the laws of Virginia, as Depositor, First Union National Bank, as Property Trustee, First Union Trust Company, National Association, as Delaware Trustee, and the Administrative Trustees named therein, including the designation of the terms of the Capital Securities as set forth therein.  The Holder is entitled to the benefits of the Guarantee Agreement, dated as of October 5, 1999 (the "Guarantee Agreement"), entered into by Southern States Cooperative, Incorporated and First Union National Bank, as guarantee trustee, to the extent provided therein.  The Issuer Trust will furnish a copy of

(continued...)

stock and the series A securities, collectively referred to herein as the Securities, are securities as defined in section 165(g)(2).

The Securities generally provided for quarterly dividend payments that under certain circumstances could be unilaterally deferred by Southern States. Southern States ceased paying and began to defer the quarterly dividends payable on the series B preferred stock beginning with the April 2002 quarterly dividend. In October 2002 Southern States notified GK Co-op that the quarterly dividends on the series A securities for that quarter and subsequent quarters were deferred and would not be paid by Southern States.

In early 2004 Southern States offered to redeem the Securities from GK Co-op for less than GK Co-op had paid for them.[7] At that time GK Co-op was planning to merge with and into its wholly owned subsidiary GK Inc., a for-profit business corporation taxable under subchapter C of the Code, and to take the

---

[6](...continued)
the Trust Agreement and the Guarantee Agreement to the Holder without charge upon written request to the Issuer Trust at its principal place of business or registered office.

Upon receipt of this certificate, the Holder is bound by the Trust Agreement and is entitled to the benefits thereunder.

[7]The terms of the Securities neither required Southern States to offer to redeem the Securities from GK Co-op nor required GK Co-op to accept such an offer or make a counteroffer.

company public shortly after the end of its 2004 tax year. GK Co-op made a counteroffer of $31.5 million in May 2004 because it wanted to dispose of the Securities and remove them from its balance sheet before making the public offering. Southern States rejected GK Co-op's counteroffer and instead proposed to redeem the Securities for $20 million.

At a meeting held on May 24, 2004, GK Co-op's board of directors decided to abandon the Securities for no consideration because a $98 million ordinary loss would produce tax savings greater than the $20 million offered by Southern States. As a result, GK Co-op rejected the $20 million offer and ceased all negotiations with Southern States. At the time, GK Co-op valued the Securities at $38.8 million on its Generally Accepted Accounting Principles (GAAP) financial statements.

On June 24, 2004, GK Co-op voluntarily and irrevocably surrendered the Securities to Southern States and the Trust for no consideration[8] and recorded a

---

[8]GK Co-op sent Southern States and Wachovia Bank, the registrar for the series A securities, letters dated June 24, 2004, stating that GK Co-op was irrevocably abandoning, relinquishing, and surrendering all of its rights, title, and interest to the Securities. The letters requested that Southern States and Wachovia take all necessary actions to remove GK Co-op's name and all other references to its ownership of the Securities. GK Co-op attached to the letter sent to Southern States the stock certificate for the series B preferred stock and a signed stock power. GK Co-op also attached to the letter sent to Wachovia the certificate for

(continued...)

$38.8 million loss on its GAAP financial statements for the tax year ended June 30, 2004. After surrendering the Securities, GK Co-op had no further ownership interest in Southern States or the Trust. The parties have stipulated that immediately before GK Co-op surrendered the Securities they were worth at least the $20 million Southern States offered to pay for them.

On its timely filed Form 990-C for the tax year ending June 30, 2004, GK Co-op reported a $98.6 million ordinary loss deduction under section 165(a) and pursuant to section 1.165-2(a), Income Tax Regs.[9] In October 2004 GK Co-op converted from a cooperative association to a for-profit corporation and merged

---

[8](...continued)
the series A securities and a signed stock power. By letter dated June 28, 2004, Southern States acknowledged its and Wachovia's receipt of the letters and the stock certificates attached thereto. Southern States also agreed to remove GK Co-op's name from the appropriate securities registers and to take all other necessary actions to carry out GK Co-op's surrender of the Securities.

[9]The parties stipulated into evidence a copy of an opinion letter dated July 30, 2004, from the law firm of Alston & Bird, LP, to GK Co-op, setting forth its opinion as to the Federal income tax treatment of the loss that GK Co-op had incurred when it abandoned the Securities (opinion letter). Respondent objects to the opinion letter only with respect to the deficiency on the ground of relevancy because respondent has conceded the accuracy-related penalty. Therefore, respondent's objection to the opinion letter on ground of relevancy as to the deficiency is sustained because that involves an issue of law. See Fed. R. Evid. 401. In addition, the opinion letter acknowledges that there "can be no assurance that the Service will not take a position contrary to our opinion or that a court will not hold contrary to our opinion."

into GK Inc., and GK Inc. completed an initial public offering of its common stock.

In 2007 petitioner completed its acquisition of all the stock of GK Inc., and GK Inc. merged with and into petitioner. On December 1, 2008, petitioner and certain of its subsidiaries commenced a voluntary case under chapter 11 of title 11 of the United States Code (Bankruptcy Code) in the U.S. Bankruptcy Court for the Northern District of Texas, Fort Worth Division. See In re Pilgrim's Pride Corp., No. 08-45664 (Bankr. N.D. Tex. filed Dec. 1, 2008).

On December 21, 2009, respondent issued the statutory notice of deficiency to petitioner as successor in interest to GK Co-op with respect to GK Co-op's tax year ending June 30, 2004. The notice of deficiency determined, inter alia, that GK Co-op's loss on the abandonment of the Securities was a capital loss rather than an ordinary loss as claimed by GK Co-op on its tax return.[10]

When the notice of deficiency was issued, petitioner was prohibited by section 362(a)(8) of the Bankruptcy Code from filing a petition in the Tax Court to challenge the determined deficiency. On December 28, 2009, the debtors'

_____

[10]In the petition, petitioner did not allege error with respect to respondent's adjustments in the notice of deficiency (i) allowing GK Co-op an additional bad debt deduction, (ii) adjusting GK Co-op's net operating loss, and (iii) adjusting GK Co-op's minimum tax credits from an earlier year.

amended joint plan of reorganization under chapter 11 of the Bankruptcy Code, as modified, became effective, and petitioner was no longer prohibited from filing a petition in the Tax Court.[11]  On May 26, 2010, petitioner timely filed a petition in this Court, challenging respondent's determination that GK Co-op's loss on the abandonment of the Securities was a capital loss rather than an ordinary loss as claimed by GK Co-op on its tax return and the accuracy-related penalty. Respondent now concedes the penalty.  See supra note 2.

## Discussion

### A.    Section 165(a)

Generally, section 165(a) allows as a deduction any loss sustained during the taxable year that is not compensated for by insurance or otherwise.  A loss from the sale or exchange of a capital asset is subject to the limitations on capital losses under sections 1211 and 1212.[12]  Sec. 165(f).  In the case of a corporation,

---

[11]Respondent filed numerous proofs of claim in the bankruptcy case for various Federal taxes including, but not limited to, income tax related to the deficiency determined in the notice of deficiency.  Petitioner timely objected to the proofs of claim in the Bankruptcy Court.  Pursuant to the order of the Bankruptcy Court entered July 8, 2010, the Bankruptcy Court will resolve respondent's proofs of claim and petitioner's objection to those claims in accordance with the final resolution of the underlying Federal tax disputes in this case.

[12]Sec. 1212(a) establishes rules governing carrybacks and carryovers of a corporation's net capital losses, permitting such losses to offset capital gains in

(continued...)

capital losses from sales or exchanges of capital assets are allowed only to the extent of capital gains from sales or exchanges of capital assets. Sec. 1211(a). Although by its terms section 1211 does not apply to gain or loss resulting from a disposition that is not a "sale or exchange", see, e.g., Helvering v. William Flaccus Oak Leather Co., 313 U.S. 247 (1941) (demonstrating that the term "sale or exchange" is narrower than the term "sale or other disposition"), Congress has enacted numerous statutes that require capital gain and/or loss in certain situations where the dispositions are technically not sales or exchanges, including, inter alia, section 165(g), applicable to losses for worthless securities, and section 1234A, applicable to certain terminations of rights or obligations with respect to property that is (or on acquisition would be) a capital asset.[13] If a disposition of a capital asset is not a sale or exchange or required by statute to be treated as such, section 1211 does not apply and the loss allowable under section 165 is an ordinary loss.

---

[12](...continued)
certain earlier or later years.

[13]See also, e.g., secs. 302 (stock redemptions), 1038 (foreclosures) 1234 (loss attributable to failure to exercise certain options to buy or sell property), 1234B (certain securities future contracts), 1235 (transfers of patents other than transfers by gift, inheritance, or devise), 1241 (cancellation of lease or distributor's agreement), 1271 (retirement of debt instruments).

See, e.g., Halata v. Commissioner, T.C. Memo. 2012-351, at *19 (theft loss deducted against ordinary income).

It appeared to the Court that section 1234A might require the loss attributable to the abandonment of the Securities to be deemed a loss from the sale of a capital asset. We therefore sought the parties' views on the issue.[14] Respondent argues that section 1234A applies, but petitioner argues that it does not. We address their arguments herein.

B.     Section 1234A

Section 1234A provides:

SEC. 1234A.  GAINS OR LOSSES FROM CERTAIN TERMINATIONS.

Gain or loss attributable to the cancellation, lapse, expiration, or other termination of--

(1) a right or obligation (other than a securities futures contract, as defined in section 1234B) with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer, or

_____

[14]The parties did not address sec. 1234A in their opening and reply briefs. However, because it appeared to the Court that sec. 1234A might determine the proper tax treatment in this case, we ordered the parties to file supplemental briefs on the issue. On July 2 and 5, 2013, respondent and petitioner, respectively, filed second supplemental reply briefs addressing the application of sec. 1234A to the surrender of the Securities.

(2) a section 1256 contract (as defined in section 1256) not described in paragraph (1) which is a capital asset in the hands of the taxpayer,

shall be treated as gain or loss from the sale of a capital asset. The preceding sentence shall not apply to the retirement of any debt instrument (whether or not through a trust or other participation arrangement).

The parties agree that the Securities are property and were capital assets in the hands of GK Co-op. Shares of stock are intangible interests or rights that the owner has in the management, profits, and assets of a corporation, while the certificate of stock is tangible evidence of the stock ownership of the person designated therein and of the rights and liabilities resulting from such ownership. Commissioner v. Scatena, 85 F.2d 729, 732 (9th Cir. 1936), aff'g 32 B.T.A. 675 (1935); Howbert v. Penrose, 38 F.2d 577, 579 (10th Cir. 1930); Storrow v. Tex. Consol. Compress & Mfg. Ass'n, 87 F. 612, 615 (5th Cir. 1898). Shares of stock "generally have been recognized as resting in contract, or, technically, as 'choses in action.'" First Nat'l Bank of Bos. v. Maine, 284 U.S. 312, 327-328 (1932). Stock, like any other chose in action, is a contract susceptible of ownership. See Burnet v. Wells, 289 U.S. 670, 679 (1933) (finding that a policy of life insurance is a contract susceptible of ownership like any other chose in action); Estate of

Davenport v. Commissioner, 184 F.3d 1176, 1185 (10th Cir. 1999), aff'g T.C. Memo. 1997-390.

The rights set forth in the certificate of the series A securities are similar to the stock rights set forth in the certificate of the series B preferred stock. The series A securities, as well as the series B preferred stock, were intangible property comprising those rights. The value of the Securities was attributable to the aggregate value of those intangible rights, and the loss from the abandonment of the Securities is the result of the termination of those rights.

Respondent asserts that the surrender of the Securities terminated all of petitioner's rights with respect to those capital assets, and therefore section 1234A requires that the loss be treated as a loss from the sale or exchange of capital assets. In contrast, petitioner asserts that under section 1234A a right or obligation with respect to property refers only to a contractual or other derivative right to property and not property rights inherent in the ownership of the property. Therefore, petitioner contends that section 1234A does not apply to the cancellation, lapse, expiration, or termination of GK Co-op's property rights in the Securities.

Statutes are to be construed so as to give effect to the plain meaning of the words in the text unless we find that a word's plain meaning is inescapably

ambiguous.  United States v. Am. Trucking Ass'ns, 310 U.S. 534, 543-544 (1940);

Venture Funding, Ltd. v. Commissioner, 110 T.C. 236, 241-242 (1998), aff'd

without published opinion, 198 F.3d 248 (6th Cir. 1999); Rath v. Commissioner,

101 T.C. 196, 200-201 (1993).  Where legislative "'will has been expressed in

reasonably plain terms, that language must ordinarily be regarded as conclusive.'"

Negonsott v. Samuels, 507 U.S. 99, 104 (1993) (quoting Griffin v. Oceanic

Contractors, Inc., 458 U.S. 564, 570 (1982)).  We interpret the text with reference

to the legislative history primarily to learn the purpose of the statute and to resolve

any ambiguity in the words in the text.  Landgraf v. USI Film Prods., 511 U.S. 244

(1994); Commissioner v. Soliman, 506 U.S. 168, 174 (1993); Trans City Life Ins.

Co. v. Commissioner, 106 T.C. 274, 299 (1996).  "Moreover, where a statute is

clear on its face, we require unequivocal evidence of legislative purpose before

construing the statute so as to override the plain meaning of the words used

therein."  Rath v. Commissioner, 101 T.C. at 200-201 (citing Halpern v.

Commissioner, 96 T.C. 895, 899 (1991), and Huntsberry v. Commissioner, 83

T.C. 742, 747-748 (1984)).

    1.    Plain Meaning

    We look first to the relevant text of section 1234A:  "Gain or loss

attributable to the cancellation, lapse, expiration, or other termination of * * * a

right or obligation * * * with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer * * * shall be treated as gain or loss from the sale of a capital asset."

Petitioner appears to argue that, under section 1234A, it is the right or obligation that must be a capital asset in the hands of the taxpayer, and therefore section 1234A does not apply because GK Co-op's inherent rights in the Securities were not themselves capital assets in the hands of GK Co-op. The flaw with that argument is made obvious by the facts that (1) section 1234A applies to gain or loss on the termination of a right or obligation with respect to property that would <u>upon acquisition</u> become a capital asset in the hands of the taxpayer, and (2) a taxpayer cannot incur gain or loss on the termination of a right or obligation that the taxpayer has not yet acquired. Thus, it is not the right or obligation with respect to property but the property itself that must be <u>or on acquisition</u> become a capital asset in the hands of the taxpayer. Here, the Securities were capital assets in the hands of GK Co-op and the question is whether section 1234A applies to the termination of the rights with respect to those capital assets when they were surrendered.

Petitioner's primary position is that the phrase "right or obligation with respect to property" means a contractual and other derivative right or obligation

with respect to property and not the inherent property rights and obligations arising from the ownership of the property. We disagree.

Webster's Third New International Dictionary 1934 (2002) defines the prepositional phrase "with respect to" to mean "as regards: insofar as concerns: with reference to". In its everyday usage the phrase "rights with respect to property" includes the rights inherent in the ownership of the property, including stock. See, e.g., United States v. Craft, 535 U.S. 274, 282-283 (2002) (stating that the taxpayer's husband had "the following rights with respect to the entireties property: the right to use the property, the right to exclude third parties from it, the right to a share of income produced from it, the right of survivorship, the right to become a tenant in common with equal shares upon divorce, the right to sell the property"); Singleton v. Commissioner, 439 U.S. 940, 940 (1978) (Blackmun, J., dissenting) (stating that the issue was whether a cash distribution that the taxpayer received "with respect to his shares" in a corporation was taxable to him as a dividend or whether the distribution was an untaxed return of capital); United States v. Byrum, 408 U.S. 125, 149 n.33 (1972) (refers to stock "with respect to which the right to vote was retained"); Anschutz Co. v. Commissioner, 664 F.3d 313, 328 (10th Cir. 2011) (stating that agreements significantly altered the shareholder's "dividend rights with respect to the pledged shares"), aff'g 135 T.C.

78 (2010); <u>Florida v. United States</u>, 285 F.2d 596, 598-599 (8th Cir. 1960) (referring to an amended court's order that provided: "The receiver appointed herein is hereby vested with all of the rights and powers with respect to said stock, including voting rights, which could be exercised by the owners of said stock at this time".); <u>Trotz v. Commissioner</u>, 43 T.C. 127, 132 (1964) (stating that: "Petitioner's rights with respect to the stock * * * were so complete that they were tantamount to ownership by petitioner for the purposes of section 1239."), <u>rev'd</u>, 361 F.2d 927, 929 (10th Cir. 1966).

Most significantly, Congress has used the phrase "with respect to property" in other provisions of the Code to include rights arising out of the ownership of the property or characteristics of the property. <u>See, e.g.</u>, secs. 126(e) ("no adjustment to basis shall be made with respect to property"), 704(c)(1)(A) ("income, gain, loss, and deduction with respect to property"), 772(c)(3)(A) ("an item of income or expense * * * with respect to property held for investment"), 877A(h)(1)(A) ("the amount of gain recognized with respect to property disposed of by the taxpayer"), 954(i)(4)(A) ("unearned premiums and reserves of a qualifying insurance company * * * with respect to property, casualty, or health insurance contracts"). Indeed, Congress has used the phrase "with respect to stock" to refer to rights arising from ownership of the stock. <u>See, e.g.</u>, secs. 301(a)

("a distribution of property * * * made by a corporation to a shareholder with respect to its stock"), 993(a)(1)(E) (qualified export receipts of a corporation include "dividends * * * with respect to stock of a related foreign export corporation").

We hold that the plain meaning of the phrase "a right or obligation * * * with respect to property" encompasses the property rights inherent in intangible property as well as ancillary or derivative contractual rights.

2.    Legislative History

Petitioner asserts that the legislative history to the 1997 amendment of section 1234A shows that Congress intended that section 1234A apply only to contractual and other derivative rights and obligations with respect to property and not to the inherent property rights and obligations arising from the ownership of the property. We disagree.

Section 1234A was added by the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 507, 95 Stat. at 333, when Congress adopted a number of provisions dealing with offsetting contractual interests in actively traded personal property commonly known as straddles. See S. Rept. No. 97-144, at 143-154, 170 (1981), 1981-2 C.B. 412, 468-473, 480. Congress believed that a change in the sale or exchange rule with respect to straddles was "necessary to prevent tax-

avoidance transactions designed to create fully deductible ordinary losses on certain dispositions of capital assets, which if sold at a gain, would produce capital gains."[15]  Id. at 170, 1981-2 C.B. at 480.

Congress made relatively minor changes to section 1234A in the Technical Corrections Act of 1982, Pub. L. No. 97-448, sec. 105(e), 96 Stat. at 2387, and in the Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 102(e)(4), 98 Stat. at 624, and a major change in the Taxpayer Relief Act of 1997 (TRA 1997), Pub. L. No. 105-34, sec. 1003(a)(1), 111 Stat. at 909-910.  Before TRA 1997, section 1234A applied only to (1) personal property of a type that is actively traded that is (or would be on acquisition) a capital asset in the hands of the taxpayer, except for stock that was not part of a straddle or of a corporation that was not formed or

---

[15]As originally enacted in the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. No. 97-34, sec. 507(a), 95 Stat. at 333 (1981), sec. 1234A provided: "Gain or loss attributable to the cancellation, lapse, expiration, or other termination of a right or obligation with respect to personal property (as defined in section 1092(d) (1)) which is (or on acquisition would be) a capital asset in the hands of the taxpayer shall be treated as gain or loss from the sale of a capital asset."  As originally enacted by ERTA sec. 501, 95 Stat. at 325, sec. 1092(d)(1) defined personal property as "any personal property (other than stock) of a type which is actively traded".  In the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1003(a)(1), 111 Stat. at 909-910, Congress broadly extended the application of sec. 1234A by substituting "property" for "personal property (as defined in sec. 1092(d)(1))".

availed of to take positions which offset positions in personal property of its shareholders) and (2) "section 1256 contracts" that were capital assets.

The legislative history to TRA 1997 shows that Congress believed that the law was deficient because (1) it taxed transactions involving capital assets that were economically equivalent to a sale or exchange of a capital asset differently from a sale or exchange, (2) it effectively provided some, but not all, taxpayers with an election to treat gains from modifications of property rights as capital gains or losses from such modifications as ordinary losses, and (3) its lack of certainty made the tax laws unnecessarily difficult to administer. See S. Rept. No. 105-33, at 134-235 (1997), 1997-4 C.B. (Vol. 2) 1067, 1214-1315. By TRA 1997 Congress broadly extended the application of section 1234A beyond just straddles and other transactions exploited by tax shelter promoters to all types of property that are (or on acquisition would be) capital assets in the hands of the taxpayer.

In describing the then-current law, the Senate Finance Committee referred to the considerable amount of litigation dealing with whether modifications of legal relationships between taxpayers are to be treated as a "sale or exchange". Id. at 132-136, 1997-4 C.B. (Vol. 2) at 1213-1216. As an example, the committee cited Fairbanks v. United States, 306 U.S. 436 (1939), where the Supreme Court held that gain realized on the redemption of bonds before their maturity was not

entitled to capital gain treatment because the redemption was not a "sale or exchange".  The committee also pointed to court decisions holding that a disposition that occurs as a result of a lapse, cancellation, or abandonment produces ordinary income or loss because it is not a sale or exchange of a capital asset.  The committee gave the following examples:  Commissioner v. Pittston Co., 252 F.2d 344 (2d Cir. 1958) (holding the amount taxpayer received for cancellation of its exclusive right to purchase coal company's entire coal output did not constitute a "sale or exchange" because the payments were in lieu of profits that would have been taxed as ordinary income), rev'g 26 T.C. 967 (1956); Commissioner v. Starr Bros., Inc., 204 F.2d 673 (2d Cir. 1953) (holding payment retail distributor received from manufacturer for waiver of contract provision prohibiting the manufacturer from selling to the distributor's competition was not a sale or exchange), rev'g 18 T.C. 149 (1952); Gen. Artists Corp. v. Commissioner, 205 F.2d 360 (2d Cir. 1953) (holding amounts received by a booking agent for cancellation of a contract to be the exclusive agent of a singer was not a sale or exchange), aff'g 17 T.C. 1517 (1952); Nat'l-Standard Co. v. Commissioner, 749 F.2d 369 (6th Cir. 1984) (holding transfer of foreign currency to discharge the taxpayer's liability was not a "sale or exchange" of that currency, and loss on transfer was an ordinary loss), aff'g 80 T.C. 551 (1983); Stoller v.

Commissioner, 994 F.2d 855 (D.C. Cir. 1993) (holding losses incurred before the enactment of section 1234A on the cancellation of forward contracts to buy and sell short-term Government securities that formed a straddle were ordinary because the cancellation of the contracts was not a "sale or exchange"), aff'g in part, rev'g in part T.C. Memo. 1990-659.

Petitioner points to those examples and the committee's statement that it "believes that some transactions, such as settlements of contracts to deliver a capital asset, are economically equivalent to a sale or exchange of such contracts since the value of any asset is the present value of the future income that such asset will produce." S. Rept. No. 105-33, supra at 134, 1997-4 C.B. (Vol. 2) at 1214. Petitioner asserts that the examples and statement show that Congress intended section 1234A to apply only to contractual and other derivative rights and obligations with respect to property and not to the inherent property rights and obligations arising from the ownership of the property. To the contrary, we do not think that the examples do more than show that section 1234A applies broadly to derivative contractual rights and obligations as well as inherent property rights. We think Congress' intent that section 1234A also apply to rights inherent in the property is evidenced by the committee's example of the redemption of a bond which, like a share of stock, is intangible property--a bundle of contractual rights.

See First Nat'l Bank of Bos., 284 U.S. at 327-328 ("[B]oth [stock and bonds] generally have been recognized as resting in contract, or, technically, as 'choses in action.'"). The example of a redemption of a bond is most significant given that Congress had long since overturned the result in Fairbanks by enacting the predecessor of section 1271(a) in the Revenue Act of 1934, ch. 277, sec. 117, 48 Stat. at 714-715.

Moreover, the Senate Finance Committee was critical of the existing law because it taxed similar economic transactions differently and effectively provided taxpayers with an election to sell the property right if the resulting transaction results in a gain or extinguish the property right if the resulting transaction results in a loss. The intended effects of extending section 1234A to all types of property that are capital assets "would be to remove the effective ability of a taxpayer to elect the character of gains and losses from certain transactions" and "to reduce the uncertainty concerning the tax treatment of modifications of property rights." S. Rept. No. 105-33, supra at 135, 1997-4 C.B. (Vol. 2) at 1215.

In our view Congress extended the application of section 1234A to terminations of all rights and obligations with respect to property that is a capital asset in the hands of the taxpayer or would be if acquired by the taxpayer,

including not only derivative contract rights but also property rights arising from the ownership of the property.

3.  Amendment of Section 1.165-5, Income Tax Regs.

Petitioner also argues that the amendment in 2008 to section 1.165-5, Income Tax Regs., generally applicable to securities that become worthless during the taxable year, shows that the Department of the Treasury does not interpret section 1234A to apply to property ownership rights.  Pursuant to section 165(g), if a security that is a capital asset becomes worthless during the taxable year, the loss resulting therefrom is treated as a loss from a sale or exchange.  The regulation promulgated under section 165(g) clarifies that, if a security that becomes worthless during the taxable year is not a capital asset, the loss is deductible under section 165 as an ordinary loss.  Sec. 1.165-5(b), Income Tax Regs.  The regulation, promulgated in 1960, was first amended in 1972 and remained unchanged until 2008.  In 2008 the regulation was amended by adding a new paragraph (i) which provides that (1) a security that becomes wholly worthless includes a security that is abandoned and (2) if the abandoned security is a capital asset (and is not a worthless security of certain affiliated corporations described in section 165(g)(3)), the resulting loss is treated as a loss from the sale or exchange of a capital asset.

Petitioner argues that, if section 1234A applies to the deductibility of a loss on abandonment of property under section 165, there would have been no reason for the Department of the Treasury to have added paragraph (i) to the regulation and concludes that: "[t]he only logical conclusion that can be reached based on the existence of the Regulation and its history is that Treasury did not, and it currently does not, believe that Section 1234A applies to the abandonment of a security." Petitioner also argues that the regulation creates an exception to section 1234A for securities in affiliated corporations. We disagree.

Under section 165(g)(3) a security in a domestic corporation that is affiliated with the taxpayer is not treated as a capital asset. Thus, the regulation does not create an exception to section 1234A; it is the more specific provision of section 165(g)(3) that creates an exception for affiliated corporations. Thus, section 1.165-5(i), Income Tax Regs., gives effect to, and is consistent with, section 1234A, as well as section 165(g)(3). Moreover, the fact that the regulation was not issued until 2008 is irrelevant. The Commissioner is not required to assert a particular position as soon as the statute authorizes such an interpretation. Dickman v. Commissioner, 465 U.S. 330, 343 (1984); Dresser Indus., Inc. v. United States, 238 F.3d 603, 609 (5th Cir. 2001); Yarbro v. Commissioner, 737 F.2d 479, 483 (5th Cir. 1984), aff'g T.C. Memo. 1982-675.

4.    Abandonment Losses:  Section 1.165-2, Income Tax Regs., and Rev. Rul. 93-80, 1993-2 C.B. 239

On its return GK Co-op claimed an ordinary loss on the surrender of the Securities as an abandonment under section 1.165-2(a), Income Tax Regs. However, the regulation does not apply to, and an abandonment loss deduction is not allowed for, "losses sustained upon the sale or exchange of property, losses sustained upon the obsolescence or worthlessness of depreciable property, casualty losses, or losses reflected in inventories required to be taken under section 471."  Sec. 1.165-2(b), Income Tax Regs.  Consequently, GK Co-op's claimed abandonment loss is disallowed by section 1.165-2(b), Income Tax Regs., because the loss from the surrender of the Securities is deemed to be a loss from a sale or exchange of a capital asset pursuant to section 1234A.

Petitioner argues that, if section 1234A applied to the deductibility of a loss on abandonment of intangible property under section 165 after it was amended in 1997, the commissioner would have revised Rev. Rul. 93-80, 1993-2 C.B. 239. We disagree.

Rev. Rul. 93-80, supra, addresses the character of a loss on the abandonment of a partnership interest when the taxpayer's share of partnership liabilities is reduced as a result of the termination of his ownership in the

partnership. In situation 1 there was a deemed distribution to the partner resulting from the reduction in his share of partnership liabilities. The ruling held that the loss on the abandonment was a capital loss. In situation 2, the partner was not entitled to include any portion of partnership liabilities in the basis of his partnership interest and did not receive any actual or deemed distributions when he abandoned his partnership interest. The ruling held that the loss in situation 2 was an ordinary loss. The ruling holds that a loss incurred on the abandonment or worthlessness of a partnership interest is an ordinary loss only if sale or exchange treatment does not apply. The ruling makes clear that, if a provision of the Code requires the transaction to be treated as a sale or exchange, such as when there is a deemed distribution attributable to the reduction in the partner's share of partnership liabilities pursuant to section 752(b), the partner's loss is capital. Rev. Rul. 93-80, supra, was issued four years before section 1234A was amended in 1997 to apply to all property that is (or would be if acquired) a capital asset in the hands of the taxpayer. As we previously stated, the Commissioner is not required to assert a particular position as soon as the statute authorizes such an interpretation, whether that position is taken in a regulation or in a revenue ruling. Dickman v. Commissioner, 465 U.S. at 343; Dresser Indus., Inc., 238 F.3d at 609; Yarbro v. Commissioner, 737 F.2d at 483.

5.    Section 1234A Applies to Surrender of Securities

The surrender of the Securities terminated all of GK Co-op's rights with respect to the Securities which were capital assets in the hands of GK Co-op. The loss on the surrender of the Securities is attributable to the termination of those rights. Accordingly, the loss is treated as a loss from the sale of a capital asset pursuant to section 1234A.

C.    Conclusion

Petitioner is not entitled to a deduction for an abandonment loss pursuant to section 1.165-2(a), Income Tax Regs., on the surrender of the Securities, because the losses are treated as losses from a sale or exchange pursuant to section 1234A. See sec. 1.165-2(b), Income Tax Regs. However, pursuant to section 165(f), petitioner is entitled to a capital loss on the surrender of the Securities, as allowed by respondent.

In reaching our holdings, we have considered the arguments and contentions of the parties not discussed herein, and conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent with respect to the deficiency and for petitioner with respect to the accuracy-related penalty</u>.